372 So.2d 1282 (1979)
MOBILE PRESS REGISTER, INC., a corporation, et al.
v.
Jimmy FAULKNER.
77-329.
Supreme Court of Alabama.
April 6, 1979.
As Corrected On Denial of Rehearing May 11, 1979.
*1283 C. B. Arendall, Jr., and Edward S. Sledge, III, Mobile, for appellants.
Irvin J. Langford of Howell, Johnston, Langford, Finkbohner & Lawler, M. A. Marsal of Seale, Marsal & Seale, Mobile, and Owen, Ball & Wills, Bay Minette, for appellee.
EMBRY, Justice.
This appeal, by Mobile Press Register, Inc., a corporation and its business manager and publisher, W. J. Hearin, is from a judgment entered against them on a jury verdict in favor of Jimmy Faulkner for the sum of $25,000 in a libel action. We reverse.
The issues for review are manifold. Among them are these crucial questions:
1. Was the issue of plaintiff Faulkner's status as either a private person, public official or public figure, improperly submitted to the jury?
2. Assuming Faulkner's status to be either of those enumerated in one above, did the trial court err in instructing the jury regarding the current law of libel applicable to the status of plaintiff and the facts of the case?
We shall address these issues in light of the landmark decision of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), its progeny, and the current law of libel in Alabama.[1]
*1284 This action arose as a result of the publication of four news articles by the Mobile Press Register. The articles were published between 29 May 1975 and 18 December 1975. In essence they stated: (1) Faulkner, when stepping down as Chairman of North Baldwin County Hospital Board, gave public indication that he was leaving the hospital in good financial condition when in fact a fiscal crisis was occurring; (2) Faulkner, while President of Bay Minette Mills, Inc., had promised investors that its bonds were a good investment, but then refused to pay off the bonds and threatened to discontinue paying interest if bondholders attempted to convert their bonds to common stock; (3) Faulkner, as Chairman of the Bay Minette Industrial Development Board, had a conflict of interest in his business and public enterprises, made a false oath that he had no interest as stockholder, director, etc., and had no intention of acquiring such interest in Den-Tal-Ez Manufacturing Co., Inc., but after the proceeds of a bond issue of the Board in the amount of 2.5 million dollars went to Den-Tal-Ez, Faulkner was named a director of that company; and (4) Faulkner, while a legislator in the early 1950's had sponsored a presently unpopular captive county road bill[2] for Baldwin County over objection of the County Commission.[3]
On the basis of these publications Faulkner filed a four count complaint alleging that each article libeled him by the meaning conveyed to the reader by the innuendo alleged in counts one, two and four and by means of the words alone contained in the third article. He alleged damage to character, that he was held up to public hatred, contempt and ridicule, together with monetary losses. The defendants answered, denying they had libeled Faulkner and asserting four additional defenses: (1) failure of Faulkner's complaint to state a claim upon which relief could be granted; (2) truth; (3) fair comment; and (4) qualified privilege. After the jury returned a verdict for Faulkner, defendants moved for judgment notwithstanding the verdict and in the alternative for a new trial. The trial court denied their motions and then this appeal was perfected.

I
We can dispose of this appeal of a libel action, in which punitive and compensatory damages are claimed, by deciding the threshold issue of whether Faulkner was a public official or public or private figure. This issue must be resolved first because the manner of its resolution determines what elements of proof are necessary for recovery. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny mandate that no public figure may recover compensatory or punitive damages for libel unless actual malice as defined in Sullivan is proved: a publication made with actual knowledge of its falsity or made with reckless disregard of its truth or falsity.[4] If plaintiff be a private figure, he or she need not prove Sullivan malice unless punitive damages are claimed.[5]Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Consequently, whether plaintiff must prove Sullivan malice in addition to the other elements of libel depends on determination of his status, as a matter of law, which must be made by the trial court. Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Browning v. Birmingham News, 348 So.2d 455 (Ala. 1977). In the trial of a libel action, at the close of all the evidence, the trial court *1285 must first determine as a matter of law whether the plaintiff is a public official or a public or private figure. Without making this determination the trial court cannot know how to properly instruct the jury.
In this case the trial court charged the jury that it was to determine from the evidence whether Jimmy Faulkner was a public figure. Defendants timely objected to this instruction. This erroneous instruction alone requires reversal. However, we will inquire further into the record in order to determine whether, as a matter of law, the plaintiff is, in fact, a public figure.
The United States Supreme Court has defined public figures to be:
"* * * [those who are] involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." Curtis Publishing Co. v. Butts, supra, 388 U.S. at 164, 87 S.Ct. 1975 at 1996.
"* * * Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures * * *

* * * * * *
"* * * [those who] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." Gertz v. Robert Welch, Inc., supra, 418 U.S. at 342, 345, 94 S.Ct. at 3008-3009.
Thus the threshold issue is resolved by an examination of the plaintiff's standing in society and his activity in the public arena.
An examination of the evidence in this case reveals that few men have obtained the prominence in their community as has Jimmy Faulkner. Throughout his life he has maintained an active role in civic and political activities. His career in public life began approximately 40 years ago when he was elected Mayor of the City of Bay Minette. He was later elected a delegate to the Democratic National Convention and in 1950 he was elected to the State Senate where, in his first year, he was named Outstanding Freshman Senator. He continued to serve until 1954 when he then unsuccessfully sought to be elected Governor. In 1958, he again ran unsuccessfully for Governor.
For over 40 years, he has been and still is Secretary-Treasurer of the Baldwin County Democratic Executive Committee. He became a member of the State Democratic Executive Committee in the early 1950's. He was a stand-in speaker for former Governor Wallace in a Wallace campaign for nomination as the Democratic Party candidate for President of the United States during the latter's convalescence from gunshot wounds, and spoke on Wallace's behalf throughout the South and Midwest. He also played a major role in the 1972 Democratic Party National Convention.
Plaintiff was appointed Trustee of the Alabama Girls Industrial School in 1948. In 1971, he was appointed to the State of Alabama Industrial Development Board and has served as its Vice Chairman. He has been a Director of the Alabama State Chamber of Commerce since 1947. He has been a member of the Board of the Alabama Cancer Society for some 12 or more years and is Chairman of the Board of Trustees of Alabama Christian College. He has been on the Gulf States Seafood Commission. Faulkner is on governmental boards too numerous to list. He testified he knows of no other person in Baldwin County who has served on, or is still serving on, as many governmental boards as he. He served as Chairman of the Junior College Committee, regarding location in the City of Bay Minette of what was then called Yancey State Junior College. This public institution has since been renamed in his honor and is now known as James F. Faulkner State Junior College.
*1286 Faulkner has owned several newspapers and radio stations. He continues to write editorials for The Baldwin County Times, as well as occasional news articles, and has served as President of the Alabama Press Association and has been named "Journalist of the Year." Faulkner has made public addresses on many different subjects at many different functions and continued to do so even during the year of the trial of this action: 1977.
Faulkner's activities in the public arena both past and present are so diverse that any one of them of itself possibly could cause him to be a public figure. The following activities relevant to Faulkner's career have been held to be determinative factors in other jurisdictions regarding public figure status: conducting a radio program, holding press conferences, making public appearances, being outspoken on subjects of public interest, Williams v. Trust Co. of Georgia, 140 Ga.App. 49, 230 S.E. 45 (1976); being an unsuccessful candidate for political office, Perkins v. Mississippi Publishers Corp., 241 So.2d 139 (Miss.1970); being chairman of a City Republican Committee, News-Journal Company v. Gallagher, 233 A.2d 166 (Del.1967); being chairman of a campaign committee, Thompson v. Evening Star Newspaper Company, 129 U.S. App.D.C. 299, 394 F.2d 774 (1968), cert. den. 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160; and being a newspaper publisher and attempting to influence public opinion through editorials, Gibson v. Maloney, 231 So.2d 823 (Fla.1970). For further examples, see Adams v. Frontier Broadcasting Company, 555 P.2d 556, 560 n. 4 (Wyo.1976).
The key to resolution of this issue lies not only in each individual factor, but also in their sum. They are component parts as well as indicators of Jimmy Faulkner's fame. Public figures are "numerous and include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done." (emphasis added). Cepeda v. Cowles Magazines and Broadcasting, Inc., 392 F.2d 417, 419 (9th Cir. 1968); Rosanova v. Playboy Enterprises, Inc., 411 F.Supp. 440 (S.D.Ga.1976).
Simply put, Jimmy Faulkner is a famed figure throughout Alabama. There can be no question but that Jimmy Faulkner was, and is, a public figure. He occupies a position of such power and influence that he must be deemed a public figure for all purposes. Even had we not so found, we would hold he is a public figure with regard to the published news articles. Of the allegedly libelous articles, one referred to activity of Faulkner while he was a public official. The other three articles commented on his conduct while chairman of: a public hospital governing board; a public industrial development board; and a non-profit industrial development board which sold bonds to the public. One who is not a public figure for all purposes may be a public figure for limited purposes. Gertz v. Robert Welch, Inc., supra, 418 U.S. at 351, 94 S.Ct. 2997. In this case Faulkner's status and activity make him a public figure both by virtue of his fame for who he is and what he has done as well as regards the published news articles.
Faulkner contends that even if this were once true, he no longer remains a public figure for any purpose. We disagree. The fact that he has not held or run for public office since 1958 does not necessarily lead to the conclusion that he has lost his public figure status. He has since held public and private positions of influence and power and has thrust himself into public controversies to influence their outcome. The mere lapse of time is not decisive in any event. The press is entitled to make historical comment on past controversial issues involving persons who were public figures at the time. See Time, Inc. v. Johnston, 448 F.2d 378 (4th Cir. 1971); Meeropol v. Nizer, 381 F.Supp. 29 (S.D.N.Y.1974). The activities of Faulkner discussed in the articles were matters in which Faulkner was involved, were of public interest, were controversial subjects and therefore were legitimate topics for comment. The article about the captive county road legislation concerned the actions of a State Senator while in office and remains open for future debate.
*1287 Nor do we agree with Faulkner's contention that he is not a public figure because his membership on various city and county boards is nonremunerative. See Gertz v. Robert Welch, Inc., supra, 418 U.S. at 351-52, 94 S.Ct. 2997. His status as a public figure did not arise solely from his membership on various governing boards. Most probably his appointment to the boards was a result of his prominence. However, even if his status depended only on these memberships, he would, in this case, be a public figure. Three of the published articles were directly concerned with the functioning of these boards. Clearly, Faulkner was a public figure in controversies regarding them.

II
Since we hold Faulkner to be a public figure as a matter of law we must reverse for that reason alone. Because Faulkner was a public figure, additional proof was required for recovery. We assume arguendo, without so holding, that the articles were false and defamatory of Faulkner. We will not address the issue of whether or not defendants would have prevailed under their fair comment doctrine defense. See E. Seelman, Law of Libel and Slander in the State of New York, Vol. 1, pp. 282-334 (1964); 50 Am.Jur.2d, Libel and Slander §§ 289-295 (1970).
The trial court submitted the issue of whether Faulkner was a public figure to the jury and charged the jury that if it determined Faulkner was a public figure, he could only recover upon proof of malice. Concerning malice, the trial court gave the jury the following written instruction requested by Faulkner and objected to by appellants:
"The Court charges the jury that actual or express malice may be shown by evidence of previous ill will, or hostility, or threats, or rivalry, or other actions, or former libels or slanders emanating from the defendants, or by the violence of the defendant's language, or the mode and extent of publication, including the recklessness of the publication."
This instruction is erroneous in two respects. First, it fails to contain the constitutional requirement that the jury must find by clear and convincing evidence that the articles were published with Sullivan malice, that is, with actual knowledge of their falsity or with reckless disregard of their truth or falsity. Second, the instruction indicates that the additional burden required in the case of a public official or figure is met upon proof that the articles were published with ill will or evil intent.
The trial court was apparently confused about the multisense term "malice." See Black's Law Dictionary, pp. 1109-10 (4th ed. 1951). Although the United States Supreme Court has used the term "actual malice," it is clear from Sullivan and it progeny that the term as used by that Court is synonymous with, and only with, "knowledge of falsity or reckless disregard of truth or falsity." Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1965); Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 20 A.L.R.3d 972 (1966). This is because a false and defamatory publication may be made purposefully to do harm, yet if it is made without knowledge of its falsity and without reckless disregard of its truth or falsity, the defamed public figure may not recover. The rationale for this rule was stated in Garrison v. State of Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964):
"* * * even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth. * *"
Accordingly, we hold the trial court committed reversible error in failing to properly instruct the jury concerning Sullivan *1288 malice. Although not necessary for reversal we note the trial court also erred in giving, over objection of appellants, instructions submitted by Faulkner which indicated that if they found that the articles exposed Faulkner to public ridicule or contempt, the law would presume damages. These instructions were erroneous because, absent a finding of Sullivan malice, damages may not be presumed. Gertz v. Robert Welch, Inc., supra, 418 U.S. at 347-349, 94 S.Ct. 2997; Bryan v. Brown, supra, at 583.
We now proceed to consider the contention of the appellants that their motion for judgment notwithstanding the verdict should have been granted because the verdict was unsupported by clear and convincing evidence showing the publication was made with Sullivan malice. Careful examination of the record by this court substantiates this contention. There is no semblance of clear and convincing evidence showing appellant, Mobile Press Register, Inc., published the articles knowing they were false or with reckless disregard of whether they were false or not.
Our decision being as it is, we pretermit discussion of the numerous other claimed errors which occurred during the trial of this case. The judgment below as to each defendant is reversed and this action remanded.
REVERSED AND REMANDED.
TORBERT, C. J., and BLOODWORTH, MADDOX, FAULKNER and ALMON, JJ., concur.
JONES, J., concurs specially.
SHORES, J., not sitting.
BEATTY, J., concurs in result.
JONES, Justice (concurring specially):
I concur in the holding of the majority. The "public figure" issue is relevant only to the claim of compensatory damagesas to the punitive damages, it is immaterial whether the plaintiff is a public or private figure.

ON REHEARING
EMBRY, Justice.
Opinion corrected. Application for Rehearing overruled.
MADDOX, Justice.
On rehearing, I concur that the application for rehearing should be overruled, because the trial judge incorrectly charged the jury on Sullivan malice; however, I believe that Herbert v. Lando, ___ U.S. ___, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), which was released after this Court released the original opinion in this case, is authority for the proposition that even though hostility, ill will and evil intent are not the equivalent of Sullivan malice, proof of them could be relevant and material on the issue of Sullivan malice.
JONES, Justice.
On rehearing, I extend the remarks expressed in my specially concurring opinion to include the following: While hostility, ill will, and evil intent are not the equivalent of Sullivan malice, proof of these elements, under appropriate circumstances, may be admissible on the issue of Sullivan malice. Herbert v. Lando, ___ U.S. ___, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

Appendix to follow.

*1289 APPENDIX A

May 29, 1975
Many residents turning to other medical facilities

Bay Minette Infirmary in trouble

By RUSTY REIN and SANDRA BAXLEY Press Staff Reporters
BAY MINETTE, Ala.The Bay Minette Infirmary is in serious trouble and needs help.
Though optimism surrounded the announcement of plans for the 55-bed facility in 1967, many north Baldwin County residents are now turning to other hospitals in southwest Alabama for medical care.
A study by The Mobile Press of hospital financial records and minutes of the North Baldwin County Hospital Board (a public, tax-supported corporation which operates the facility) shows:
Consistent financial losses throughout the five-year history of the hospital.
Repeated requests by the hospital's auditor to improve bookkeeping or risk losing patients.
A drastic drop in patients from an average daily census of 40.2 in October, 1972, to 17 last month.
Inability of the board to satisfy the five doctors in the area with hospital conditions.
Refusal by Blue Cross of Alabama to pay $2,000 in requested reimbursements because of "lack of supporting data" and "weakness in internal control and operating procedures."
Regular turnover of hospital administrators (three in the five-year history of the facility).
Refusal by two of the five physicians to admit patients in the hospital.
Allegations by physicians that the board is not working for the betterment of the hospital.
An apparently illegal meeting by the Baldwin County Commission which resulted in the appropriation of a $50,000 grant to the hospital.
At least one occasion when some hospital bills were not paid for at least a six-month period.
Serious consideration of constructing a 98-bed nursing home despite warnings by the hospital's administrator of a financial crisis.
A hospital inspection report which noted a large number of incomplete medical records.
Low morale among hospital employes which included a threat of a walkout by the Inhalation Therapy Department.
An offer by the hospital's certified public accountant, after three years of recommendations about haphazard bookkeeping, to train employes working with accounts or insurance claims.
A warning by the same accountant that almost 15 per cent of the hospital's insurance claims were taking more than 120 days to process instead of the normal 30 days.
The North Baldwin County Hospital Board was incorporated on Oct. 24, 1967, by James H. Faulkner Sr., Charles A. Bodden and James A. Wurst with the consent of the Baldwin County Commission.
Since then, a two-mill property tax levied in the north part of Baldwin County has resulted in about $300,000 given the board for operation of the hospital.
Regular grants have also been given the hospital by county, state and federal governments.
*1290 Faulkner served as chairman of the hospital board until December, 1973, when his term expired. Faulkner was succeeded in the chairmanship by his long-time associate, Bodden. Bodden has since resigned from the board and was replaced last week as chairman by Albert Thompson of Bay Minette.
When Faulkner left the board he gave public indication that he was leaving the hospital in good financial condition but board minutes show a fiscal crisis was occurring at the time of his departure.
On Dec. 4, 1973, at the meeting when Faulkner announced he was leaving the hospital board, Clifford Wood, the hospital's certified public accountant, stated the hospital was in "serious financial trouble."
Minutes show the board decided to ask the Baldwin County Commission for financial assistance at a meeting the same day in the doctors' lounge of the hospital. A $50,000 grant was approved by the commission in an apparent illegal executive session, according to hospital board minutes.
"The County Commission came to the hospital and met with the committee," the minutes said, "Mr. Thompson was the Hospital spokesman and explained our financial crisis to the commissioners.
"The Commissioners went into executive session to discuss the matter. Later the committee members were invited back into the meeting and were advised that the hospital was approved for a grant of $50,000.
"The Commission also announced that Mr. C. A. Bodden was reappointed for another term on the hospital Board. Two new appointees to the hospital Board were Mr. Charles Strong and Mr. Lauren Jones." (referring to Laurens Jones)
Alabama's Public Meetings Laws forbid executive sessions or secret meetings of public boards or commissions except "when the character or good name of a woman or man is involved." The law provides a fine of between $10 and $500 for violation of the statute.
When contacted today by The Mobile Press, Thompson agreed that the facts in the story are accurate reports of the situation, but said he wished attention had been given to the hospital throughout its short life.
"We do have problems," he said, "but there are a lot of good things you haven't mentioned.
"You haven't mentioned the number of people who have been helped, or how hard members of the board and volunteer groups have worked."
Thompson said all the problems of the hospital would be solved if "more doctors would send more patients. We just don't have enough patients to pay for the services we need to offer."
Financial losses and decreases in the patient load at the hospital have resulted in serious fiscal problems at the hospital during the last two years.
Minutes show the hospital suffered a loss of $28,749.20 from Oct. 1, 1973, to March 31, 1974.
Recent financial records show the hospital has lost another $32,178.57 from Oct. 1, 1974, to April 30 of this year. The records show $17,480.90 of the loss came last month when the hospital recorded its lowest average daily census (17) in its history.
These disheartening figures come after the first year of the hospital's history in which a profit was made1974.
In 1974 the hospital made $35,436.14, which still left it with a fund balance deficit of $157,468.57.
In 1971, first year of operation, it lost $99,465.74.
In 1972 it lost $22,912.62.
In 1973 it lost $39,425.30.
*1291 Hospital Board secretary Jones said the reason it was operating at a loss was because of the low patient load.
Everyone agrees on the fact.
In the 1971 audit, accountant Clifford Wood warned "Over 100 patients' bills contained errors. People were very outspoken about this. Continued loss of confidence and respect could cause the people to go elsewhere. This would mean financial disaster."
Disharmony among the board, physicians and employes in the past two years apparently led to the recent resignation of Burt Davidson, the third hospital administrator in the history of the facility.
When contacted by The Mobile Press for comment, Davidson said that he did not feel it would do any good to comment.
One of the hospital board members (who has requested to remain unidentified) told The Mobile Press that the "state of confusion" in which the hospital has been since its inception has come from "a lack of know-how on the parts of all concerned."
The member said he hopes the recent appointment of a doctor (Dr. George Halliday) to the board will make the physicians more content and will help things run more smoothly.
He said it was not employe dissatisfaction with Davidson which led to his resignation so much as doctor dissatisfaction.
The members said the board is now trying to hire an administrator trained in a school in Birmingham.
The board member said, in reference to the construction of a nursing home addition, "We were hoping it might improve conditions but the doctors wouldn't agree."
Present members of the hospital board, in addition to Thompson, Jones, Strong and Dr. Halliday, are Doris Hodgson, John McMillan Sr., Luella Ferguson, Dick Johnson and Robert Wills. Mrs. Lee Mitchell serves as an ex officio member and publicity director.
Though minutes of board meetings show continued doctor dissatisfaction, physicians in the town are apparently mollified by Dr. Halliday's appointment to the board.
Dr. David Davis is not presently admitting patients to the hospital, but a spokesman said yesterday he will rejoin the hospital staff in mid-summer.
Since February he has referred patients to Mobile or to another doctor if they required hospitalization, according to his spokesman.
Dr. Tyler Nichols would not discuss specifics at the hospital, saying he had left the hospital staff for "personal reasons" but was back on it again now.
He said he was not completely satisfied, but that complete satisfaction would be "stagnation."
Unless something is done about the current state of the Bay Minette Infirmary, the future of hospital service to North Baldwin County residents remains uncertain.

*1292 June 12, 1975
Invested in Baldwin firm

Bondholders still awaiting repayment
EDITOR'S NOTEThis is the first article in a two-part series dealing with industrial financing in Baldwin County.

By SANDRA BAXLEY and RUSTY REIN Press Staff Reporters
BAY MINETTE, Ala.Though three and one-half years past due, some Bay Minette Mills, Inc., bondholders are still awaiting repayment of bonds purchased more than 13 years ago.
At that time, $141,600 in bonds were brought by 178 Bay Slacks employes, businessmen and community leaders who were relying on promises by Bay Minette Mills president James H. Faulkner that the bonds would be a good investment.
Bay Minette Mills had been described as a type of civic corporation interested in promoting industry in Baldwin County.
One direction in which Bay Minette Mills turned to help Baldwin County industry was Bay Slacks.
The bonds were to be redeemed in 1971 according to large type on the cover of the bonds. Smaller type on the inside stated Bay Minette Mills could at that time redeem the bonds for common stock in the corporation instead of for cash.
But when the year arrived in which the bonds were to be paid, Faulkner sent bondholders a two-page letter asking them not to cash in their bonds or exchange them for common stock in the corporation.
What he wanted them to do was just to sit tight.
Not many people had read the small type saying bonds could be exchanged for common stock instead of money if Bay Minette Mills so desired.
And not many of those who had read it remembered it.
Therefore, there were a lot of disgruntled people around, according to bondholders.
There wasn't much they could do, however, because the letter from Faulkner threatened to stop paying the six per cent interest the bonds had been paying if bondholders demanded bonds be exchanged for common stock.
Here's how the letter put it:
"Even though the bonds state they may be transferred for common stock, ... the directors voted unanimously to ask you to please continue holding your bonds in their present status. By doing this, it will assure, if nothing unforeseen happens, that you will continue to receive six per cent interest each year.
"To transfer the bonds to common stock," the letter continues, "will make it impossible for your corporation (Bay Minette Mills) to continue paying this interest rate because it will change from an interest expense to a dividend, and we'll be forced to pay taxes on it, while at present we are tax exempt on bonds.
"Although we have been able to pay stockholders six per cent in the past, there is no assurance that this can be continued in the future. It cannot, if the bonds are transferred to common stock."
Faulkner's letter did hold out a glimmer of hope, however.
He said officers of Bay Minette Mills had been in contact with the parent company of Bay Slacks, BVD and the Glen Alden Company of New York, and had asked them to redeem "all" the bonds.
The letter from Faulkner to the bondholders stated:
"Your officers have worked diligently during the past several months attempting to get the parent company of Bay Slacks, BVD and the Glen Alden Company of New York City, to buy the building and land where they are now located, redeem all of the stock and bonds and at the same time expand the building (which they are interested in doing). Although they have indicated an interest in doing this, they have not taken the step as of this time. We are hopeful this will happen."
*1293 But a letter Faulkner had written to BVD official Darryl Chason some 16 days before the bondholder letter did not ask BVD to buy "all" the bonds.
It only asked him to buy the $22,400 in bonds held by employes or widows of employes.
The 75 owners of the other $119,200 would be asked to hold their bonds for an indefinite time.
Faulkner wrote Chason:
"If your company could buy these bonds (of employes and widows of employes) from the 103 local owners, it would reduce the holders to only 75. We would ask the 75 who own $119,200 to continue holding their bonds for an indefinite period. Since most of these are businessmen they realize the importance of the operation of Bay Slacks. I am confident most of them will be agreeable.
"If you can do this it will greatly relieve local pressure and be excellent public relations on the part of your fine company. It means you would own $22,400 more equity in the local property which is worth twice the original investment.
"I am enclosing a complete list of the bondholders and the 103 have a cross mark to the left of their names."
Earlier in Faulkner's letter to Chason he had told Chason why Bay Minette Mills could not pay off the bonds.
"Of course, we do not have any cash to pay off these bonds," the letter stated.
More than three years have passed and bondholders have still not received any communication from Bay Minette Mills that the situation has changed or if cash is available to pay off the bonds.
As of Dec. 30, 1971, officers of Bay Minette Mills were Faulkner, Bruce Beveridge, C. A. Bodden and Allan C. Mott.
Serving with these four as directors of the corporation were J. T. Bradley Jr., Emmanuel Davidson and Albert Thompson.

PAST DUE BONDSome of the bonds, such as the one above, which were issued by Bay Minette Mills, Inc., more than 13 years ago today remain unpaid, despite being three and one-half years past due. In a letter to bondholders written at the time the bonds matured in 1971, corporation president James H. Faulkner said he did not want the bondholders to exercise either of the two actions availablegetting cash for the face value of the bonds or converting them to common stock in the corporation.

*1294 June 13, 1975
Records of panel are cited

Baldwin board's deals in conflict?
EDITOR'S NOTEThis is the second of two articles dealing with Baldwin County industrial financing. The first article appeared in yesterday's issue of The Mobile Press.

By RUSTY REIN and SANDRA BAXLEY Press Staff Reporters
BAY MINETTE, Ala.The City of Bay Minette Industrial Development Board has provided millions of dollars to finance new and expanding industries in north Baldwin County.
The board, a public panel appointed by the Bay Minette City Commission, decides which industries qualify for tax-exempt, industrial board financing.
Records of the board show several instances in which board members are involved in possible conflicts of interest.
One of the board's largest bond issues $2.5 millionwent to Den-Tal-Ez Manufacturing Co., Inc., a subsidiary of Den-Tal-Ez, Inc., in Des Moines, Iowa.
Board records include a notarized statement by all nine members of the industrial board which pledges none of the members have an interest "as stockholder, officer, director, partner, or otherwise" in either Den-Tal-Ez Manufacturing Co., Inc., or Den-Tal-Ez, Inc.
The statement also contains a pledge that board members had "no plans or intention to acquire any such interest (in Den-Tal-Ez) during his tenure as a member" of the industrial board.
Among those signing the statement was industrial board chairman James H. Faulkner. The statement was dated May 8, 1972the same date the lease agreement for the bond issue was signed.
About three months later, in August, 1972, Den-Tal-Ez president Hal Pearson announced that Faulkner had been named to the board of directors of Den-Tal-Ez, Inc.
Another Bay Minette Industrial Development Board project involved financing totaling $720,000 between the board and Southern Aluminum Castings Co.
Baldwin County Probate Court records show Norborne C. Stone, a member of the industrial board, was one of the incorporators of Southern Aluminum Castings Co.
The financing for Southern Aluminum Castings Co. was done in two parts, according to board records. The first part was for $650,000 and the second part was for $70,000.
The second loan was financed through the First National Bank of Bay Minette, according to a letter in board records which was written in May, 1974. The letter was signed by bank president Marvin Kelly, who is also a member of the industrial board.
Another board record, a letter dated Sept. 19, 1968, illustrated a procedure for a company to follow if it wishes to work with the industrial board.
The letter was written to E. E. Davis of Meadow Sportswear, Inc., in New York and was from Thornton, Farish and Gauntt, Inc., a nationally known Alabama securities firm.
Meadow Sportswear owned a plant in Bay Minette which was leased to it by Bay Minette Mills, Inc. Faulkner, C. A. Bodden, J. B. Beveridge and Emmanuel Davidson, all members of the industrial board, are also directors of Bay Minette Mills, Inc.
"This will confirm the several conversations with Mr. Faulkner and our conversation this morning," the letter said.
"As we understand," the letter continued, "you are considering an expansion of the existing Bay Minette plant which is *1295 currently being leased by you from Bay Minette Mills, a local civic type corporation, for $1,300 per month.
"As reported to you, we recently completed a $2,000,000 issue in Bay Minette through the utilization of the Industrial Development Board of the City of Bay Minette, of which Mr. Faulkner is chairman....."
The letter then discussed two possible expansion approaches which Meadow Sportswear was contemplating. One possibility was to obtain an industrial board bond issue for $250,000 for a new facility. The second possibility was to obtain a larger bond issue to buy the existing facility from Bay Minette Mills as well as construct an expanded facility.
Thornton, Farish and Gauntt said there was no question of legality on the first approach, just mechanical procedures. "We would have to either acquire the land or get a long term lease in favor of the Industrial Development Board," the letter said.
"As to approach No. 2," the letter continued, "It will be necessary to have a showing that this acquisition and expansion will result in increased job opportunities.
"As you can see, the Alabama law is very flexible and I can state that in Bay Minette we can pretty well `tailor make' this to suit your needs, also no approval of any court, election, State AII Board, etc. is required. All (underlined) approval is done in one meeting with Mr. Faulkner and the Board."

The Mobile Press Register

Baldwin County Edition

Thursday, December 18, 1975

`Captive county' action is pushed

By MARTHA M. SIMMONS Press Register Reporter
BAY MINETTE, ALA.Local legislators met with the Baldwin County Commission Tuesday to explain their motives for setting up a committee to study Baldwin's "captive county" road program, and to urge commissioners to move ahead with the project.
Senator L. D. "Dick" Owen and Representative John McMillan were accompanied to the meeting by study committee members Buck Day, who is chairman, George Kaiser and P. M. Walker. They asked for the commission's opinions and help in getting the project started.
"Y'all are late in asking," Commissioner Bill McMillan commented, adding the legislators had neglected to inform the commission of their intentions. He said he was "hurt" that the commission knew nothing about the legislators' intent to form the committee until it was reported in the newspaper.
Rep. McMillan admitted the resolution to do a study had been conceived in the final days of the last legislative session. He said it was modeled after a bill being sponsored for another captive county questioning the value of the state handling all phases of the captive county's road building and maintenance. He said he and other local legislators thought it was a good idea for Baldwin since so many citizens and officials here are dissatisfied with the present system.
Since there was not enough time to meet the public notification requirements to make the proposal an act, Rep. McMillan said, it passed as a resolution. Because only an act can be funded through the legislature, the county was informed several weeks ago it was expected to pay for the study. However, attorneys advised the commission that it was not legal for them to finance the study. To this, the legislators responded that it would be easy enough to pass the whole thing as an act in the next special session and get funding for it, but urged the commission to get on with the project without further delay.
*1296 That problem essentially resolved, several commissioners demanded representation on what legislators billed as simply a fact-finding committee. Solons agreed to consider the commission ex-officio members, but balked at adding any more representatives to the group. The study was supposed to be non-partisan and merely a presentation of facts about the captive county system,"fair representation" should not enter into it they said.
Just the same, contended Commissioner Bill McMillan, the commission ought to get to pick their own members of the study group just as the legislators had chosen theirs. Rep. McMillan reminded Comm. McMillan that the study was, however, intended to be used by the legislature since it will take a legislative act to make whatever changes in the system may be deemed necessary. After a mildly heated exchange, the legislators agreed to the additions if Rep. Dan Kinsey, who was not present, concurred with the change. He did, and the commissioners were asked to make their choices for the positions known by the end of the day.
Late Tuesday, Commissioner Neil Lauder who had favored leaving the study committee the way it wassaid the other commissioners had chosen James H. Faulkner Sr., A. G. Allegri and Charles Barnhill to represent them on the committee.
Jimmy Faulkner was a state legislator when the captive county program was initiated back in the early 1950's. In fact, Faulkner had sponsored the bill which put Baldwin under the captive program over the objections of the county commission serving at that time. For various reasons, most of them financial, the captive program was beneficial to Baldwin for nearly 20 years. But in 1972, when Marion Wilkins assumed the position of district engineer for the highway department, roadbuilding activities dropped sharply and have been going at a snail's pace ever since, much to the aggravation of Baldwin citizens and county commission. The commission shells out over $1 million per year in gasoline taxes to finance the program here; a program they are convinced they are not getting their money's worth from.
One point that Rep. McMillan and Comm. McMillan did agree on was that if the study committee's findings indicate the road program should be taken over by the county, the assumption of these new duties could necessitate a fulltime county commission. Said Comm. McMillan, "I don't know if that wouldn't be the best thing for the county."

APPENDIX B
§ 580A. Defamation of Public Official or Public Figure
One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other person, or
(b) acts in reckless disregard of these matters.
§ 580B. Defamation of Private Person
One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.
NOTES
[1] See e. g. Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). See also Browning v. Birmingham News, 348 So.2d 455 (Ala.1977); Bryan v. Brown, 339 So.2d 577 (Ala.1976); Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975). See Comment, Libel Law: A Confused and Meandering State of Affairs, 6 Cum.L.Rev. 667 (1976).
[2] A captive county in this context is one where county road construction, engineering and maintenance are relegated to the State Highway Department.
[3] See Appendix A for full text of the publications.
[4] "Actual Malice" is a misnomer. As defined by the United States Supreme Court in Sullivan, it connotes neither the common meaning of "malice" nor the meaning attached to it in other areas of the law. For the reasons discussed in part II of this opinion we refer to this kind of malice as "Sullivan malice."
[5] See Appendix B for the law according to Restatement, Second, Torts, concerning liability of one who defames a public official, public figure, or private person.