601 So.2d 924 (1992)
Billy Joe CAMP,
v.
William N. YEAGER, Jr., and Timbes & Yeager, Inc.
1910255.
Supreme Court of Alabama.
July 2, 1992.
*925 Ted Taylor and Jerry D. Roberson of Taylor & Roberson, Birmingham, for appellant.
*926 John H. Morrow, Stewart M. Cox and John F. Goodman of Bradley, Arant, Rose & White, Birmingham, for appellees.
INGRAM, Justice.
The plaintiff, Billy Joe Camp, appeals from a summary judgment in favor of defendants William R. Yeager, Jr., and Timbes & Yeager, Inc., in a defamation action.
In the 1990 election for secretary of state, Camp, the Democratic Party's nominee, faced Perry Hand, the Republican Party's nominee. Hand had employed Yeager of the Mobile advertising firm Timbes & Yeager, Inc., as his media consultant. Yeager wrote and produced a television commercial that is at issue in this case.
The commercial opened with Hand standing in a cemetery and consisted of the following text:
"[Hand]: Since becoming secretary of state, I've been working to keep these folks from voting.
"[Voice over]: While Perry Hand's been fighting to clean up the voters' list and curb election fraud, what's his opponent done? When Billy Joe Camp was president of the Public Service Commission, we got hit with three rate increases. As a reward, Georgia Power paid him over 700 thousand dollars in consulting fees. A clear choice. Perry Handa tough secretary of state who's cracking down on corrupt politics."
The commercial was broadcast several times during the week of October 2-8, 1990, on television stations in Birmingham, Huntsville, Mobile, and Montgomery.
Camp had served as president of the Public Service Commission ("PSC") in the early 1980s. During that time, Alabama Power Company received three rate increases. Camp voted against each rate increase request by Alabama Power; however, those rate increases were granted pursuant to orders of this Court.
Sometime after Camp left the PSC, he started a consulting firm. He entered into an agreement with Georgia Power Company to perform economic development work, labor relations consulting, and consulting on public relations and regulatory affairs pertaining to nuclear generation of electric power. Camp's firm received payments in excess of $700,000 for these services. On May 14, 1990, an article appeared in the publication Bill Shipp's Georgia revealing the payments. The article was based on information from the annual filings of Georgia Power Company.
Shortly after the November election, Camp brought this action alleging defamation. The complaint sought compensatory and punitive damages for the malicious publication of false statements that Camp alleged were contained in the television commercial. The complaint sought damages from four defendants: Yeager; Timbes & Yeager, Inc.; Hand; and Jack Edwards, chairman of Hand's campaign.
Yeager and Timbes & Yeager filed a motion for summary judgment. The trial court granted the motion, and the judgment was made final pursuant to Rule 54(b), A.R.Civ.P. Camp appealed.
On appeal Camp raises two issues: (1) whether the television commercial contained an actionable defamatory statement; and (2) whether Camp produced sufficient evidence of actual malice to withstand the appellees' motion for summary judgment.

Actionable Statement
A summary judgment is appropriate upon a showing that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. In reviewing a summary judgment, this Court will view the evidence in the light most favorable to the nonmovant and will resolve all reasonable doubts against the movant. Fincher v. Robinson Bros. Lincoln-Mercury, Inc., 583 So.2d 256 (Ala.1991).
Whether a communication is reasonably capable of a defamatory meaning is, in the first instance, a question of law. Harris v. School Annual Publishing Co., 466 So.2d 963, 964 (Ala.1985). "Thus, if the communication is not reasonably capable of a defamatory meaning, there is no issue of *927 fact, and summary judgment is proper." Id. at 964-65. However, if the trial court finds that the statement is reasonably capable of a defamatory meaning, "it is then for the jury to say whether [the statement was] in fact so understood." W. Page Keeton, et al., Prosser and Keeton on Torts § 111, at 781 (5th ed. 1984).
The test to factually determine the defamatory nature of a statement is that meaning that would be ascribed to the language by a reader or listener of "average or ordinary intelligence, or by a common mind." Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137, 142 (1975). In determining whether the television commercial at issue was libelous,[1]
"[its] actionable character is to be taken in [its] natural meaning according to the sense in which [it] appears to have been used, and the idea [it] convey[s] to those who heard and saw [it]. [It is] not to be measured by [its] effect when subjected to the critical analysis of a trained legal mind, but must be construed and determined by [its] natural and probable effect upon the mind of the average television viewer."
Gray v. WALA-TV, 384 So.2d 1062, 1065 (Ala.1980).
If the words employed in the allegedly libelous publication are understood to impute dishonesty or corruption to an individual, they are actionable. Id.
Taking the television commercial in its entirety, this Court holds that the television commercial was reasonably capable of a defamatory meaning. Also, after reviewing the entire record, we find that a genuine issue of material fact was presented as to whether such a defamatory meaning was understood.

Actual Malice
Since New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), it has been clear that the First Amendment requires that, to be actionable, an alleged defamatory statement by a defendant against a public official (now public figures) must be made with actual malice. The present law is equally clear that such actual malice must be shown with "convincing clarity." Since Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "clear and convincing" has been the standard mandated not only to the jury sitting for this type of case, but to the trial judge as well in his determination of the defendant's motion for summary judgment. So, we must look to a standard higher than substantial evidence in the present case, because it is written that the First Amendment requires it. We, therefore, leave our substantial evidence test used for summary judgment in most other cases so that we might apply that higher standard in this case.
A close reading of Anderson v. Liberty Lobby, Inc., or, perhaps more appropriately, a "traipsing through the maze," will, we hope, lead to an understanding of the essential requirements and their application to the present case.
The principal requirement of a plaintiff if he is to survive a properly supported motion for summary judgment is that he must satisfy the trial judge that there is a genuine issue of material fact. The substantive law of the case must be utilized by the trial judge to aid him in determining whether there are critical facts to be determined, disputed facts that could affect the decision of a jury; yet the role of the substantive law must be for the purpose of identifying to the trial judge those facts that are critical to the case.
A trial judge is not required "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," id. at 249, 106 S.Ct. at 2511, nor is there any requirement for him to make a finding of fact.
In reversing the summary judgment, we are satisfied that there are facts that are critical to a proper resolution of this case, a resolution that can be made only by a finder of facta jury. We find support for our *928 determination within the following language from Anderson: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trialwhether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250, 106 S.Ct. at 2511.
The parties agree that Camp is a public figure and as such cannot recover for libel unless he offers proof that the libelous publication was made with "actual malice." See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The term "actual malice" is "synonymous with, and only with, `knowledge of falsity or reckless disregard of truth or falsity.'" Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282, 1287 (Ala.1979) (emphasis in original). Therefore, a false and defamatory statement may be made purposefully and with ill will toward the public figure, and yet the law refuses the public figure a remedy if the statement was made without knowledge of the falsity or without reckless disregard of its truth or falsity. Id. The rationale for this rule is:
"Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth."
Id. (quoting Garrison v. Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964)).
On the particular issue of actual malice in this case, we have looked at the evidence in the record, viewing the evidence in the light most favorable to the nonmovant, Camp, and allowing all reasonable inferences from that evidence, to determine whether the trial court correctly found that Yeager and Timbes & Yeager were entitled to a summary judgment based on the issue of actual malice.
In addition to these tests, we have also examined the evidence in search of a genuine issue involving material facts; and we have considered whether those facts are critical; whether they are in dispute on the issue of actual malice; and whether they are facts that can be fairly resolved only by a jury. We have assessed the trial judge's view of the above matters within the framework of the "clear and convincing" standard. We are now compelled to conclude that the trial judge erred when he granted Yeager and Timbes & Yeager's motion for summary judgment.
We are satisfied that Camp has presented evidence that, if believed by a jury, would be sufficient to support a finding, by clear and convincing evidence, that Yeager knew that the statement, as understood, was false.

The Benchmarks
The facts or happenings of this case are largely undisputed. A political campaign was underway; the political advertisement was aired on four television stations in this state; and, most importantly, the statements of the advertisement are without dispute. There are, however, two important factual disputes that a jury must determine in this case: (1) whether the statement was understood as imputing some sort of corrupt conduct to Camp; and (2) whether, if a jury finds that the statement was understood as imputing corrupt conduct to Camp, Yeager knew that such an imputation was false. The first factual dispute must be resolved by determining the "meaning that would be ascribed to the language by a reader or listener of ordinary or average intelligence, or by a `common mind,'" Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137, 142 (1975), and is not to be determined by "critical analysis of a trained legal mind," Gray v. WALA-TV, 384 So.2d 1062, 1065 (Ala.1980).
The "common mind" concept is the conduit that carries this case through the summary judgment stage to the jury for resolution. The value of the statement as suggesting corrupt conduct must be measured by "common mind" jurors, as opposed to a trained legal mind. This is so because political statements, if they are to be effective, *929 must be designed to appeal to the general public, the citizensthe votersin an effort to persuade them that the thrust of the statements is true or has merit, either favorable to the candidate who makes those statements or unfavorable to his opponent.
We have no hesitancy to excerpt certain language from Anderson, language that we perceive supports our conclusion that this case should be presented to a jury:
"Our holding that the clear and convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."
Id. at 255, 106 S.Ct. at 2513 (citations omitted).
The determination of whether the summary judgment here should be denied on the issue of actual malice is whether the evidence in the record could support a jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.
Finally, we note, as an earlier Court noted:
"`The issue of actual malice on the part of defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns "motive, intent, and subjective feelings and reactions."'"
Loveless, 325 So.2d at 143 (quoting Goldwater v. Ginzburg, 261 F.Supp. 784 (S.D.N.Y.1966), aff'd, 414 F.2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970)). For reasons indicated, not the least of which is the necessity of a jury's opportunity to weigh and determine credibility and subjective intent, we find this case uniquely suited for presentation to a jury. We, therefore, determine that the factual disputes here should be presented to a jury for decision pursuant to the "clear and convincing" evidence standard mandated by the current law.
The summary judgment entered in favor of Yeager and Timbes & Yeager is reversed, and this cause is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, ADAMS and STEAGALL, JJ., concur.
HOUSTON, J., concurs specially.
MADDOX, J., dissents.
HOUSTON, Justice (concurring specially).
In the June 22, 1992, issue of The New Yorker, at page 28, a cartoon depicts a robed judge on the bench, with fingers touching and a pontificating smile, who says: "Call it `legislating from the bench,' if you will, but on this occasion I should like to repeal the First Amendment."
After reading Justice Maddox's excellent dissent, as one who is voting with the majority, I felt like a fellow traveler with the judge in the aforementioned satirical drawing. I write to address Justice Maddox's dissent.
Does New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), protect the publication of known lies about a political opponent made for the sole purpose of gaining a political advantage? If it does, my vote is wrong. New York Times protects debate on public issues that is "uninhibited"[2] ("Not inhibited; open.... Free from the expected social or moral constraints"); "robust" ("vigorous; hardy, *930 boisterous, rough"); "wide-open" ("Opened completely.... Without laws or law enforcement"); "vehement" ("Characterized by forcefulness of expression or intensity of emotion, passion, or conviction; ardent; emphatic.... Marked by or full of vigor or energy; strong; violent"); and "caustic" ("Marked by sharp and bitter wit; cutting"). New York Times protects debate that uses "unpleasantly sharp attacks." 376 U.S. at 270, 84 S.Ct. at 721.
I am aware of the statement that "[t]he constitutional protection does not turn upon `the truth ... of the ideas and beliefs which are offered.'" 376 U.S. at 271, 84 S.Ct. at 721. But does this not merely protect a defamatory untruth made without actual malice? Yes. How can actual malice be proven? By proof that the false or defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 280, 84 S.Ct. at 726.
To me, the holding in New York Times is this: "[T]here was no evidence whatever that the New York Times Company was aware of any erroneous statements or [was] in any way reckless in that regard. The judgment against the New York Times Company is thus without constitutional support." 376 U.S. at 286, 84 S.Ct. at 729.
In the case at issue, there is clear and convincing evidence of actual malice. This, in my opinion, distinguishes this case from New York Times. Therefore, the trier of fact should determine whether the television commercial was defamatory, untrue, and made with knowledge of the falsity or with a reckless disregard of whether it was false or not.
The First Amendment does not make a person who seeks public office a pariah. The First Amendment is not at odds with Truth; the First Amendment was promulgated by our forebears to ensure that Truth will out.
MADDOX, Justice (dissenting).
The majority's decision, which permits the continued prosecution of this action, is wrong. It is wrong, based, at least, on these reasons:
(1) The television commercial that is the subject matter of this action was a form of core political speech that enjoys the highest, most protected position of any speech, and the majority has failed to grant it First Amendment protection, as required by the principles of law announced in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); and
(2) There are no fact questions for a jury to decide, because the plaintiff has failed to offer clear and convincing evidence that the defendant acted with actual malice; therefore, the summary judgment was appropriate, and indeed, was required under the principles of law announced in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Because the Court fails to apply the principles of First Amendment law that are uniquely applicable to this case, I must respectfully dissent.
The issue presented herewhether allegedly false and defamatory speech about a public official or political candidate is protected speechis not a new one. It was decided 28 years ago, when the Supreme Court of the United States, in the landmark case of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), established a new rule to be applied in such cases. New York Times was decided by a unanimous Court, the only disagreement being whether core political speech should be accorded a qualified privilege or an absolute privilege.[3]
The New York Times case was decided, as the Supreme Court expressed it, "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks upon government and public officials." *931 376 U.S. at 270, 84 S.Ct. at 721 (emphasis added). Considering the Supreme Court's review in New York Times of the history of the First Amendment, it is clear to me that the Court came ever so close to holding that political speech, even speech that is false and defamatory, as it was in that case, has absolute protection under the First Amendment. I recognize, of course, that the Court did not hold that political speech is absolutely privileged, but the Court did severely narrow the scope of the traditional categorical exception that had applied when defamatory speech was involved. The narrowness of this defamation exception was just recently commented upon by the current Supreme Court in a case involving the constitutionality of a socalled "hate crime" statute. R.A.V. v. City of St. Paul, Minnesota, ___ U.S. ___, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).[4]
The broad scope of the protection offered for political speech by New York Times and the narrowness of the defamation exception is shown by the following quote from that opinion:
"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."
376 U.S. 254, at 271, 84 S.Ct. 710, at 721, quoting from Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940) (emphasis added).
New York Times involved the publication of a newspaper advertisement that contained false statements about the police commissioner of Montgomery, Alabama. The purpose of the advertisement was to raise money, but the Supreme Court found that the advertisement was core political speech that was the very heart of the First Amendment. Political speech is still protected today and occupies the top position in the hierarchy of protected speech.[5]
Political speech involving public officials, especially that made during political campaigns, seems to be especially protected. To emphasize the First Amendment protection afforded core political speech, and the toughness required of those whose reputations or feelings may be affected by it, the Supreme Court, in New York Times, used as an example speech that was critical of a judge. The Court, citing and quoting from one of its prior cases involving criticism of a judge, said that "[i]f judges are to be treated as `men of fortitude, able to thrive in a hardy climate,' Craig v. Harney, supra, 331 U.S. [367] at 376, 67 S.Ct. [1249], at 1255, 91 L.Ed. 1546 [1947], surely the same must be true of other government officials such as elected city commissioners." 376 U.S. at 273, 84 S.Ct. at 722. As a footnote to this statement in its opinion, the Court noted that political speech and politicians have always operated in a different environment, and strongly suggested that political speech in political campaigns *932 is different in nature from other forms of speech:
"The climate in which public officials operate, especially during a political campaign, has been described by one commentator in the following terms: `Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air: and hints of bribery, embezzlement, and other criminal conduct are not infrequent.' Noel, Defamation of Public Officers and Candidates, 49 Col. L.Rev. 875 (1949).
"For a similar description written 60 years earlier, see Chase, Criticism of Public Officers and Candidates for Office, 23 Am.L.Rev. 346 (1889)."
376 U.S. at 274, 84 S.Ct. at 722.
Based on the foregoing, I can only conclude that the majority has ignored the teachings of New York Times that public officials and political candidates, especially in political campaigns, should be "men [and women] of fortitude" and should not expect to be protected from the "hardy climate" of the public arena.
I must also disagree with other aspects of the majority opinion. The majority states "Taking the television commercial in its entirety, this Court holds that the television commercial was reasonably capable of a defamatory meaning." To make this finding, the Court must engage in a laboratory analysis of the commercial and decide that the words "as a reward" are defamatory. In my opinion, the parties in their briefs, and the Court, at oral argument, spent too much time trying to analyze what these three words meant. The fact that so much analysis and discussion revolved around the meaning of the commercial should be proof positive that the plaintiff has failed to offer proof, with "convincing clarity," that the commercial was so defamatory that it could receive no First Amendment protection. Why should core political speech suffer such close scrutiny as the Court has given this commercial? Does the commercial lose its First Amendment protection if it is not completely true and if it hints of misconduct on the part of the plaintiff? I think not. I do not believe that political speech must suffer such close scrutiny on our part, or on the speaker's part. On the contrary, as the Supreme Court said in footnote 14 of New York Times, the climate in which public officials operate, especially during a political campaign, is a "hardy climate." "`Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent,'" notes the court. 376 U.S. at 273, 84 S.Ct. at 722.
This type of robust speech and negative campaigning is not just of recent origin. Indeed, courts have recognized that speech made about politicians has been extraordinarily harsh throughout our nation's history:
"Our political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those in or seeking public office. Washington was called a murderer, Jefferson ... insane ..., Henry Clay a pimp, Andrew Jackson an adulterer, and Andrew Johnson and Ulysses Grant drunkards. Lincoln was called a half-witted usurper, a baboon, a gorilla, a ghoul.... Franklin Delano Roosevelt was castigated as a traitor to his country. Dwight D. Eisenhower was charged with being a conscious agent of the Communist conspiracy. [Harsh criticism of politicians is] an unpleasant fact of our political backgrounda history of rough, crude, brawling, mud-slinging, muck-raking, name-calling attacks on those in or seeking political office."
Desert Sun Pub. Co. v. Superior Court, 97 Cal.App.3d 49, 158 Cal.Rptr. 519, 521 (1979). See also Clark v. Allen, 415 Pa. 484, 204 A.2d 42, 44 (1964).
Even assuming that the plaintiff has shown that the television commercial contained a false statement and that it was defamatory, that does not entitle the plaintiff to a trial on the issues. "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of *933 truthwhether administered by judges, juries, or administrative officialsand especially one that puts the burden of proving truth on the speaker." New York Times v. Sullivan, 376 U.S. at 271, 84 S.Ct. at 721. In that case, the Court also said that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the `breathing space' that they `need * * * to survive." 376 U.S. at 271-272, 84 S.Ct. at 721. "The constitutional protection does not turn upon `the truth, popularity, or social utility of the ideas and beliefs which are offered." 376 U.S. at 271, 84 S.Ct. at 721.
There is another reason why I think that the trial judge properly entered the summary judgment in this case. The substance of the television commercial was not materially different from that of a newspaper account of the same facts. In fact, the record in this case shows that the defendant created the campaign commercial based, in part, upon information contained in two published articles, one describing the plaintiff as "an Alabama political operative" who had received over $700,000 in consulting fees, and the other an Associated Press story that ran in The Montgomery Advertiser, that read, in part, as follows:
"Billy Joe Camp, former president of the Alabama Public Service Commission and a Democratic candidate for secretary of state, received more than $770,000 in consulting fees from Georgia Power Co. during a three year period, an Atlanta based newsletter reported Monday.
"....
"As head of the Alabama PSC, Camp helped regulate Alabama Power Co. whichlike Georgia Poweris a subsidiary of the Southern Co."
The Associated Press and the editors of The Montgomery Advertiser considered the receipt by Mr. Camp of over $770,000 from Georgia Power Company, the sister company of Alabama Power Company, a company that he had formerly regulated, to be newsworthy and of public interest. When I compare the news accounts with the television commercial, the implications and innuendos are basically the samea former public service commissioner has received $770,000 from a sister company of a company he regulated when he was president of the PSC. But even assuming that the implications and innuendos of the television commercial and the news stories are different, does that mean that the television commercial is not the sort of "robust speech" that the Constitution of the United States protects in cases such as this where two political candidates are engaged in the "hardy climate" of a hotly contested political race? I believe that the television commercial was just the kind of protected political speech that the Supreme Court of the United States found to be protected in New York Times.
Also, I disagree with the majority because I think that the plaintiff has failed to sustain his burden of offering "clear and convincing" evidence that the defendant was guilty of "actual malice." The plaintiff presented no evidence from which a "reasonable factfinder could conclude ... that [he] ha[s] shown actual malice with convincing clarity." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252, 106 S.Ct. at 2512. As I have already stated, if lawyers and judges have to spend as much time as we have spent trying to decide whether the commercial is true or false, then the burden of proving that it was defamatory with "convincing clarity" has clearly not been met. Let me make another point: Implicit in the majority's holding is a conclusion that the Anderson case involves federal procedural law and that this Court is not bound by it. Anderson involved federal constitutional law that is applicable to Alabama, and it must be remembered that, in New York Times, there was a trial, there was a jury verdict for the plaintiff, and the Supreme Court said: "Applying these standards, we consider that the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law." 376 U.S. at 286, 84 S.Ct. at 729.
When constitutional principles such as freedom of speech is involved, I do not *934 believe that Alabama procedural rules, if they result in a continuing violation of a defendant's constitutional rights, would be sanctioned.
As the Supreme Court noted in New York Times, political speech, especially during a political campaign, can become quite "robust," but it is protected speech. Political speech in the "hardy climate" of public affairs is the very type of speech the framers of the First Amendment were most anxious to protect. While I realize that there is a narrow category of defamatory speech that the Constitution of the United States does not protect, I fail to see how the television commercial here fits in that category.
The opinion today will have a "chilling effect" upon the right of political candidates, and others, to freely comment and express opinions on candidates and great public issues for fear of being haled into court and charged with defamation. That is regrettable.
I would affirm the judgment of the trial court, even though it is a summary judgment, because I believe the plaintiff has failed to show that he can prove by clear and convincing evidence that the defendant's speech was not protected by the First Amendment. I firmly believe that the holdings in New York Times and Anderson v. Liberty Lobby, Inc., compel such a result.
NOTES
[1] Broadcasting of defamatory matter by means of radio or television is libel. See Restatement (Second) of Torts § 568A (1966); see, e.g. Gray v. WALA-TV, 384 So.2d 1062, 1065 (Ala.1980).
[2] All definitions are from The American Heritage Dictionary of the English Language (1969).
[3] Justice Hugo Black was of the opinion that the First Amendment granted an absolute privilege. 376 U.S. at 293, 84 S.Ct. at 733 (Black, J., with whom Douglas, J., joined, concurring specially).
[4] In R.A.V. v. City of St. Paul, the majority stated: "Our decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation, see New York Times Co. v. Sullivan, 376 U.S. 254, [84 S.Ct. 710, 11 L.Ed.2d 686] (1964); Gertz v. Robert Welch, Inc. 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789] (1974); see generally Milkovich v. Lorain Journal Co., 497 U.S. 1, 13-17 [110 S.Ct. 2695, ___ _ ___, 111 L.Ed.2d 1] (1990)."
[5] In R.A.V. v. City of St. Paul, Justice Stevens, in a special concurrence, stated that "speech about public officials or matters of public concern receives greater protection than speech about other topics." ___ U.S. at ___, 112 S.Ct. at 2563 (Stevens, J., concurring in the judgment, by separate opinion, in which White, J., and Blackmun, J., concurred). Justice Stevens further stated that "[o]ur First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech and obscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all."