**DIVERSIFIED MANAGEMENT, INC., a Colorado corporation and Eugene DeWitt, Plaintiffs-Appellants,**

v.

**The DENVER POST, INC., a Colorado corporation, and John Toohey, Defendants-Appellees.**

No. 81SA491.

Supreme Court of Colorado,
En Banc.

Nov. 15, 1982.

Keller, Dunievitz & Johnson, Alex Stephen Keller, Denver, for plaintiffs-appellants.

Cooper & Kelley, P.C., Thomas B. Kelley, Paul D. Cooper, Denver, for defendants-appellees.

ROVIRA, Justice.

This is an appeal from a jury verdict in favor of defendants-appellees, The Denver Post and John Toohey, a Denver Post reporter, in a libel action brought by plaintiffs-appellants, Eugene DeWitt and Diversified Management, Inc. (DMI). Appellants' contention is that the district court committed reversible error in a number of its instructions to the jury. We disagree.

This litigation arose out of two articles written by Toohey and published by the Post on April 28 and May 12, 1974. The articles dealt with certain financial dealings of the appellants and described the relationship between DeWitt, his company (DMI), and a banker named Saul Davidson. The articles also discussed investigations of DeWitt by the Colorado Real Estate Commission, the U.S. Department of Housing and Urban Development, an Arizona grand jury, the U.S. Postal Service, and "a variety of other federal and state regulatory and law-enforcement agencies."

In 1975 a complaint was filed by appellants which included claims for libel, invasion of privacy, outrageous conduct, and conspiracy to violate civil rights under 42 U.S.C. sections 1983 and 1985. The appellees denied liability and pleaded as defenses that the appellants were public figures and that the publications involved matters of public or general concern. Subsequently, the trial court granted a partial summary judgment in favor of appellees, ruling, as a matter of law, that certain of the challenged statements were not defamatory.

Trial began in October 1979, and at the close of evidence all claims except those of libel were dismissed. After over three weeks of trial, the libel claims were submitted to the jury, which returned a verdict in favor of appellees.

Appellants appealed to the court of appeals. Because constitutional issues were raised, we accepted a transfer of jurisdiction pursuant to section 13–4–110(1)(a), C.R.S.1973. See section 13–4–102(1)(b), C.R.S. 1973.

## I.

In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court began what has been a long process of "constitutionalizing" the law of libel. The Court there held that the first and fourteenth amendments to the United States Constitution prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves with "convincing clarity" that the statement was made with "actual malice"—that is, with knowledge that the statement was false or with reckless disregard of whether it was false or not. The Court found the rule necessary to prevent "self-censorship" on the part of the press, which in the absence of the rule would make only statements that "steer far wider of the unlawful zone." 376 U.S. at 279, 84 S.Ct. at 725–726 (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). The Court believed the rule to be an appropriate balance between the competing interests of protection of reputation and the ability to engage in "uninhibited, robust, and wide-open" debate on public issues.

The rule of *New York Times* was extended to include "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The opinion covered two separate libel actions. The first, *Curtis Publishing Co. v. Butts*, involved an article in the *Saturday Evening Post* which stated that a college football coach had conspired to "fix" a football game. The second, *Associated Press v. Walker*, involved a news story that a former army general had led a charge against federal marshals attempting to enforce a desegregation decree at the University of Mississippi. The Court stated:

"Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy, but both commanded sufficient public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements."

388 U.S. at 155, 87 S.Ct. at 1991 (quoting *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927)) (Brandeis, J., dissenting).

The Court in *Butts* stated that "[t]he guarantees of freedom of speech and press were not designed to prevent 'the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential ....' " 388 U.S. at 150, 87 S.Ct. at 1989 (quoting 2 Cooley, *Constitutional Limitations* 886 (8th ed.)). Although the issues in *Butts* differed from those in *New York Times, supra,* in that the actions could not be analogized to prosecutions for seditious libel, the Court held that the public interest in the circulation of the materials involved was equally important.

The Supreme Court has described two ways that one might become a public figure:

"For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974).

In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality of the Supreme Court adopted a standard which extended the *New York Times* rule to "all discussion and communication involving matters of public or general concern." The opinion stated that "[f]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the mem-

bers of society to cope with the exigencies of their period." 403 U.S. at 41, 91 S.Ct. at 1818 (quoting *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940)). The plurality rejected the idea that the purpose of a free press was only to protect criticism of government, stating that the Founders believed that a free press would advance "truth, science, and morality" as well.

The *Rosenbloom* plurality criticized a rule that would protect only defamation of public officials and public figures, pointing out that the public interest in the incident at the University of Mississippi at issue in *Associated Press v. Walker, supra,* would have been the same if the speaker had been an anonymous student and not a well-known retired army general. Moreover, General Walker's fame stemmed from events completely unconnected with the episode in Mississippi. The plurality went on to state:

> "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."

403 U.S. at 43, 91 S.Ct. at 1819.

A majority of the Supreme Court declined to adopt the *Rosenbloom* plurality standard in *Gertz v. Robert Welch, Inc., supra,* holding that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 347, 94 S.Ct. at 3010.

Following *Gertz,* we adopted the plurality standard from *Rosenbloom,* with the limitation that "reckless disregard" for whether a statement is true does not mean that the person must have had serious doubts as to its truth. That is, we adopted *Rosenbloom,*

but without the definition of reckless disregard added by *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), to the definition of "actual malice." *Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450 (1975). We stated:

> "We hold that, when a defamatory statement has been published concerning one who is not a public official or a public figure, but the matter involved is of public or general concern, the publisher of the statement will be liable to the person defamed if, and only if, he knew the statement to be false or made the statement with reckless disregard for whether it was true or not."

188 Colo. at 98–99, 538 P.2d at 457. We reached that result because we believed that a simple negligence rule would have a chilling effect on the press that would be more harmful to the public interest than the possibility that a defamed private individual would go uncompensated. In order to honor the commitment to robust debate embodied in the first amendment and to ensure sufficient scope for first amendment values, we chose to extend constitutional protection to any discussion involving matters of public concern, irrespective of the notoriety or anonymity of those involved.

■ The considerations which led to our adoption of *Rosenbloom* now cause us to conclude that first amendment values would be better honored by adopting the same definition of "reckless disregard" in cases involving public officials, public figures, and matters of public or general concern. To the extent that *Walker* held otherwise, we now overrule it.

## II.

Resolution of two of appellants' contentions on appeal requires a determination of the status of appellants and of the nature of the matter involved—that is, whether appellants are public officials, public figures, or private figures, and whether the issues involved are matters of public or general concern. We are of the view that neither DeWitt nor DMI is a public official or public figure, but the issues involved are matters of public or general concern.

There is, of course, no question that appellants are not public officials. It is equally clear that they do not fall within the first category of public figure under *Gertz, supra*. That is, they do not "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." The closer question is whether appellants fall into the second category, that is, whether they have placed themselves in the forefront of a public controversy in order to influence the resolution of the issues involved.

■ In determining whether a person is a public figure, a court must examine the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979). In *DiLeo v. Koltnow*, Colo., 613 P.2d 318 (1980), we were faced with the question of whether a discharged police officer was a public figure in the limited area of a controversy concerning his termination from the police department and his various suits seeking reinstatement and redress for alleged violations of his civil rights. DiLeo had initiated contact with several newspapers and reporters because he believed the cases to be newsworthy and he wanted to get information to the public. We held DiLeo to be a public figure because "[r]ather than quietly seeking to exert his legal rights, he invited public attention and comment." 613 P.2d at 322.

Appellees assert that this same reasoning applies to appellants' conduct in these matters and consequently appellants are public figures. Appellees describe DeWitt's "ostentatious and grand style, which was bound to invite media attention and comment." They also describe a 1969 news conference called by DeWitt, in which he accused the Better Business Bureau of racial bias after he began having difficulties with the bureau in connection with a carpet business. Appellees also point to a 1974 meeting DeWitt had with reporters of the *Rocky Mountain Journal* to give his side of an unfavorable story they had written

about him. DMI is also a public figure, they argue, because it "generally reflected DeWitt's personality and style," and it made heavy use of various media channels to promote its real estate developments.

■ The mere fact that the press was attracted to appellants' activities does not make them public figures. As the United States Supreme Court stated in *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979), "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *See also Rollenhagen v. City of Orange*, 116 Cal.App.3d 414, 172 Cal.Rptr. 49 (1982) ("a publisher should not be able to define the scope of the privilege by its own determination of what it chooses to publish.").

We do not believe that *DiLeo* mandates a finding that appellants are public figures. DiLeo actively sought press coverage of the controversy surrounding his termination from the police force. Although DeWitt twice initiated contacts with reporters, he probably would have preferred no press coverage at all.

We are reluctant to make too easy a finding that one is a public figure. Up to this point, we have been focusing on the free expression rights of the press and have been concerned with the chilling effect that libel actions have on the press. There are, however, competing first amendment concerns. Just as too easy a finding of liability on the part of a newspaper has a chilling effect on its expression, too easy a finding that someone has become a public figure by virtue of responding to unfavorable publicity can have a chilling effect on the expression of a private figure. A private figure subjected to unfavorable publicity should not forfeit protection from defamation as a price of his response.

■ Appellees also argue that DMI is a public figure because of its business activities. They cite a number of cases holding that corporations, because of their statutory nature and the very fact of their doing business, are public figures. For example,

in *Reliance Insurance Co. v. Barrons,* 442 F.Supp. 1341 (S.D.N.Y.1977), a United States District Court held that an insurance company was a public figure in the general sense (i.e., the first *Gertz* category) because of its billions of dollars in assets, the fact that the insurance business is subject to heavy state regulation, and the fact that the company was offering to sell its stock, thereby thrusting itself into the public arena. Similarly, in *American Benefit Life Insurance. Co. v. McIntyre,* 375 So.2d 239 (Ala.1979), the Alabama Supreme Court held that an insurance company was a public figure because it was subject to close regulation by the government and it owed its very existence as an entity to the state. The court held that the influence of such a company on society could not be ignored.

The above-described cases do not seem consistent with *Hutchinson, supra,* where a research scientist who had received numerous federal grants brought a libel action against a United States Senator for statements surrounding the senator's awarding Hutchinson the "Golden Fleece Award." The lower courts had held that Hutchinson was a public figure for the limited purpose of comment on his receipt of federal funds for research projects. The Supreme Court, in declining to find Hutchinson to be a public figure, stated:

> "Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefited from the myriad public grants for research could be classified as a public figure—a conclusion that our previous opinions have rejected."

443 U.S. at 135, 99 S.Ct. at 2688. Similarly, one does not become a public figure merely by availing himself of the marketplace. DMI has not thus become a public figure.

The rationale for the cases almost automatically designating corporations as public figures is that business activities are affected with a public interest. Because we adopted *Rosenbloom* in *Walker v. Colorado Springs Sun, Inc.,* we need not make a blanket rule that, because businesses tend to be involved in matters of public interest, all businesses are public figures. Instead, we look to the circumstances of the case to determine whether it is a matter of "public or general concern," regardless of whether the parties involved are corporations.

■ Having concluded that appellants are not public figures, we now consider whether the publications involved matters of public or general concern. We need not precisely define the outer boundaries of the term "public or general concern" at this point, for the activities involved here are clearly within them. The matters involved here are alleged widespread and ongoing land-development schemes of questionable propriety. Not all of the lots were yet sold; consequently, the "public" contained a number of potential buyers who had an abiding interest in the matter. As a result, we believe the trial court was correct in treating this case as one involving a private figure in a matter of public or general concern.

### III.

■ Appellants' first argument is that the trial court erred in instructing the jury that it should apply the "clear and convincing" standard of proof to the finding of reckless disregard. Their argument is based upon section 13–25–127(1), C.R.S. 1973, which provides that "[a]ny provision of the law to the contrary notwithstanding and except as provided in subsections (2) and (3) of this section, the burden of proof in any civil action shall be by a preponderance of the evidence." Unless the clear-and-convincing standard is constitutionally required, the statute would require that the preponderance standard be applied.

In *New York Times, supra,* the United States Supreme Court stated that malice must be proved with "convincing clarity."

376 U.S. at 285–86, 84 S.Ct. at 728–729. The plurality in *Rosenbloom, supra,* explained the need for the higher standard as follows:

"In the normal civil suit where [the preponderance] standard is employed, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' *In re Winship,* 397 U.S. 358, 371 [90 S.Ct. 1068, 1076, 25 L.Ed.2d 368] (1970) (Harlan, J., concurring). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement . . . but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate."

403 U.S. at 50, 91 S.Ct. at 1823.

When we adopted the *Rosenbloom* standard in *Walker,* we held that "liability must be supported with convincing clarity," [1] 188 Colo. at 101, 538 P.2d at 459, and in *DiLeo v. Koltnow, supra,* we equated "convincing clarity" with "clear and convincing." That our decision in *Walker* was based upon constitutional concerns is apparent from the fact that we rejected a simple negligence rule, permitted under *Gertz,* because we felt it would cast a "chilling effect upon the news media. . . ." 188 Colo. at 99, 538 P.2d at 458. Because our decision was based upon our interpretation of article II, section 10, of the Colorado Constitution,[2] the clear and convincing standard established in *Walker* supersedes the statute.

### IV.

 Appellant next argues that the definition of recklessness given to the jury was incorrect. Instruction Number 7 stated as follows:

1. The challenged conduct in *Walker* occurred prior to the effective date of section 13–25–127.

2. Article II, section 10, reads as follows:
 "Freedom of speech and press. No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or

"Recklessness implies a higher degree of culpability than negligence. A failure to exercise ordinary or reasonable care in ascertaining the truth of published material does not, standing alone, constitute recklessness. Such failure, however, may be considered as an element of recklessness. *The gist of the meaning of recklessness is that these Defendants had a high degree of awareness that the statements published were probably false.* (emphasis added).

Appellant argues that this is not a correct statement of the law in Colorado, as applied to defamation of private figures in events of public or general concern.

As discussed in part I of this opinion, when we adopted the *Rosenbloom* plurality standard, we did so with the express limitation that " 'reckless disregard' for whether or not a statement is true does not mean that there must be a finding that the person making the statement had serious doubts as to the truth thereof." 188 Colo. at 98, 538 P.2d at 457. Consequently, with respect to private persons involved in matters of public or general concern, a plaintiff was not required to show that the defendant entertained subjective doubts about the truth of the publication, but rather, he needed to show only that the statement was made with a high degree of indifference to its truth or falsity.

In availing ourselves of the flexibility given us by *Gertz,* we moved cautiously in *Walker* toward a greater degree of protection for the press. We adopted the *Rosenbloom* standard for matters of public or general concern, but did not take the final step of using the same *St. Amant* definition of "reckless disregard" that United States Supreme Court decisions required us to use in cases involving public officials and public

publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

figures.[3] We recognized that the *St. Amant* definition had the virtue of providing a more concrete guideline to a jury, but stated that "the consensus of the majority of our court is that we should not approve the *St. Amant* definition *at this time,* since the term 'reckless disregard' has had rather frequent usage in the tort field in this state." 188 Colo. at 99, 538 P.2d at 457 (emphasis added). We now believe the time has come to take this final step.

Our reason for adopting *Rosenbloom* was that the public is primarily interested in the event, rather than the actors, and that the press should not be hindered in its reporting of matters of legitimate public interest by the fear of libel actions. We now believe that the robust debate on public issues that we were seeking to protect in *Walker* is better protected by using the *St. Amant* definition of "reckless disregard" in cases involving matters of public or general concern, as well as in cases involving public officials and public figures. To the extent that *Walker* held otherwise, we hereby overrule it. As a result, the instruction given by the trial court was correct.

V.

Appellants' final contention is that the trial court's refusal to give the jury Plaintiff's tendered Instruction Number 2 was prejudicial error. That instruction contains portions of the United States and Colorado Constitutions and reads as follows:

"The Constitution of the United States in the 1st Amendment provides as follows:

"*Freedom of religion, speech and press . . . right of petition.* Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

"The Constitution of the State of Colorado, Article II, Section 10 provides as follows:

"*Freedom of speech and press.* No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the Court, shall determine the law and the fact."

 The above excerpts are clearly accurate statements of the law, but even accurate statements of the law should not be used in jury instructions if they are misleading. *See Daly v. Lininger,* 87 Colo. 401, 288 P. 633 (1930). We have also held that it is error to include statements of the law without instructing the jury on how to apply them. *Crosby v. Kroeger,* 138 Colo. 55, 330 P.2d 958 (1958). The law and its application were already given to the jury in its instructions on libel, and the form of the instructions is a matter within the discretion of the trial court. *Montgomery Ward & Co. v. Kerns,* 172 Colo. 59, 470 P.2d 34 (1970).

 As a demonstration of the lack of usefulness of an instruction containing a verbatim quotation of the first amendment, one need only consider the variety of conflicting views concerning its meaning. For example, Justice White, dissenting in *Gertz, supra,* was of the opinion that a state should be permitted to impose strict liability for defamatory falsehoods about private figures. On the other hand, Justice Black's well-known view was that the first amendment was intended to leave the press entirely immune from libel judgments. *See, e.g., Rosenbloom v. Metromedia, supra,* (Black, J., concurring). Given the diversity of views concerning the meaning of the first amendment, it is readily apparent that the tendered instruction could only have misled the jury.

The judgment is affirmed.

ERICKSON, J., dissents.

---

**3.** *See Kuhn v. Tribune-Republican Publishing Co.,* 637 P.2d 315 (Colo.1981); *DiLeo v. Kolt-* now, Colo., 613 P.2d 318 (1980).

ERICKSON, Justice, respectfully dissenting:

The opinion, from which I dissent, causes a private citizen in Colorado, who has been defamed by the news media, to have his right to recover damages restricted by the imposition of a "reckless disregard" standard of care and by requiring "clear and convincing" evidence to sustain a claim for libel. No other state has gone this far to insulate the news media against claims for libel. Because I believe that defamatory utterances are not granted sanctity by the First Amendment of the United States Constitution or Article II, section 10 of the Colorado Constitution, I respectfully dissent.

The majority opinion effectively precludes recovery against the news media by a private citizen for defamation in all but the most egregious cases. New barriers have been created which all but eliminate claims for libel against the news media. First, only those individuals who can prove "reckless disregard" can recover. That standard necessarily requires a subjective inquiry into the mental state of the employees of a news media defendant. Second, before a private individual can recover he must establish his claim by the difficult to surmount "clear and convincing" quantum of proof. Third, every matter which a court deems a "matter of general or public concern," will be insulated against redress by these standards. The amorphous and undefinable boundaries of "matters of public or general concern," however, eludes the court today and invites continuous judicial supervision of the subject matter of speech in Colorado. Only those individuals who are able to establish that they are involved in truly "private" matters will be able to vindicate their honor, dignity, and reputation against news media defendants in a libel case.

I do not believe that the interests of a strong and vigorous press demand that the balance be so badly skewed against the interests of private individuals. We invite irresponsible, inaccurate, and unreliable journalism by granting the press all but absolute immunity for defamatory publications. Our concern should be with the *quality* of information which reaches the public. Unsubstantiated, inaccurate, and unprovable innuendo which is disseminated in the news media does not create "robust and uninhibited" public debate. *See* L. Eldredge, *The Law of Defamation* § 53 (1978). In my view, the majority opinion may have the effect of reducing the amount of carefully reported information which is published.[1]

For the reasons set forth in the dissent in *Walker v. Colorado Springs Sun,* 188 Colo. 86, 538 P.2d 450 (1975), the negligence standard should provide the threshold liability for news media defendants who are sued by private plaintiffs. I also reject the court's "general or public concern" test as a useful standard for determining when the recklessness standard is applied. Lastly, Colorado's traditional preponderance of the evidence standard of proof in defamation cases should be retained.

In *Walker v. Colorado Springs Sun, supra,* the Court held that private individuals must prove reckless disregard on the part of a news media defendant. The majority concluded that a lesser standard would have a "chilling effect" on "robust debate" on the theory that it was necessary to the "public interest." Today's opinion expands

---

1. I agree with the Washington Supreme Court in *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976), which dealt with the news media's argument:

> "It has been argued by the defense that to reduce the standard first enunciated in *New York Times,* and subsequently adopted in *Rosenbloom* will have a 'chilling effect' upon the press and, therefore, result in self-censorship. We find this contention to be without merit. It is true that greater caution must

now be exercised where the subject of a publication is a private person, yet such a rule is totally justifiable in light of the state's overriding interest in providing a realistic remedy to an otherwise helpless private citizen. It cannot be gainsaid that any social value derived through a defamatory falsehood pertaining to a truly private individual is 'clearly outweighed by the social interest in order and morality.' "

*Id.* at 446, 546 P.2d at 86 (citations omitted).

*Walker's* boundaries by accepting the standard for reckless set forth in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), which held that reckless disregard could be found if there was "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731, 88 S.Ct. at 1325.

In my view, freedom of the press does not require immunity from liability for a defamatory publication. We should not ignore the rights of private individuals who have no recourse apart from the law of defamation when their reputations have been sullied by journalistic excesses. *See Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Most courts have recognized that the press can effectively and vigorously engage in public debate under a negligence standard. The requirements that sources be checked, that allegations and innuendo be documented prior to publication, and that individuals under investigation be confronted are not onerous burdens for a responsible news media. As the dissent in *Walker v. Colorado Springs Sun,* 188 Colo. at 111, 538 P.2d at 465, said:

> "[T]he public official or public figure stands on an entirely different level than the involuntary news figure—the private citizen—who is defamed in a publication because the news media deems a matter to be of public interest. The private citizen has no opportunity to rebut the false charges in any effective way. It is doubtful that a retraction would reach the same group that heard or saw the initial publication, because retractions tend to have less meaning and are printed with less fervor than the initial news

release. A reasonable balance between the right of the news media under the First Amendment and the right of the private citizen is the negligence test."

Few other jurisdictions have extended *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), so far. Even the United States Supreme Court ignored the plurality opinion in *Rosenbloom* when it realized the extreme implications that such an interpretation would have on state defamation laws. In *Gertz,* the Court held that private individuals have an interest in their reputation which is not superseded by the First Amendment's guarantee of freedom of speech, leaving the details of accommodating such interests to each state. *Id.* 418 U.S. at 347–48, 94 S.Ct. at 3010–3011.

Today's court finds a stricter standard for freedom of the press in the Colorado Constitution[2] than exists in the United States Constitution. I do not read Art. II, sec. 10 of the Colorado Constitution as affording greater protections than the First Amendment in libel cases. In fact, the plain language of our constitutional provision emphasizes that the press shall be "responsible for all abuse" of its liberty unlike the broader language of the First Amendment. Today's decision ignores Colorado's restrictive language and effectively immunizes the press from all but flagrant abuses of its privilege.

Most other state supreme courts which have examined the balance between individual protection and press freedom have supported a negligence standard.[3] Only

---

**2.** Art. II, section 10 of the Colorado Constitution provides:

> "*Freedom of speech and press.* No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

**3.** *Mobile Press Register, Inc. v. Faulkner,* 372 So.2d 1282 (Ala.1979); *Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 560 P.2d 1216 (1977); *Corbett v. Register Publishing Co.,* 33 Conn.Supp. 4, 356 A.2d 472 (1975); *Karp v. Miami-Herald Publishing Co.,* 359 So.2d 580 (Fla.App.1978); *Cahill v. Hawaiian Paradise Park,* 56 Haw. 522, 543 P.2d 1356 (1975); *Troman v. Wood,* 62 Ill.2d 184, 340 N.E.2d 292 (1975); *Newell v. Field Enterprises,* 91 Ill. App.3d 735, 47 Ill.Dec. 429, 415 N.E.2d 434 (1980); *Gobin v. Globe Publishing Co.,* 216

three other states have adopted the reckless disregard standard,[4] and none have expanded it as broadly as this court does today.

Because the state courts which examined the issue after *Walker* decision have held that negligence is the preferable standard, we should consider whether *Walker* was properly decided. For example, in *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976), the Washington Supreme Court said that negligence is a proper standard because of the need to allow private individuals compensation for injuries to their reputation. It said that important competing policies will not "tolerate the giving of near-absolute immunity to the media." In *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okl.1976), the Oklahoma Supreme Court adopted the rationale of the dissent in *Walker* as the best means for balancing the needs of the press and of individuals.

Justice Schaffer, in *Troman v. Wood,* 62 Ill.2d 184, 340 N.E.2d 292 (1975), rejected the *Walker* majority, and held that a negligence standard is the best means to encourage careful journalism and to protect individual interests. Similarly, in *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975), the Kansas Supreme Court reiterated what I believe captures the essence of the need for a reasonable balance between press and individuals: "There is no constitutional value in false statements of fact.

Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Id.* at 233, 531 P.2d at 76 (quoting *Gertz v. Robert Welch, supra* ). Most other supreme courts have reached similar conclusions. Wisdom dictates that we should bring our standard into compliance with the majority of the states, *see supra* note 3, which have rejected the *Walker* rationale, and have adopted the negligence standard as the means for protecting the competing social interests involved in defamation cases.

Additionally, no reason exists, in my opinion, to vary from the general standard of proof in negligence cases. Juries are capable of understanding and implementing the standard of proof in defamation cases as they would in any other case. The conduct of a news media defendant should be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances.[5]

The court has also substantially broadened the class of speech protected by its high standard. I am at a loss to see the logical limits of the court's conclusory statements on what constitutes a matter of "public or general concern." The majority has not provided guidance on what standards it would apply in defining such "matters." I can see no principle which would neutrally delimit what constitutes matters

Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975); *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied,* 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Martin v. Griffin Television Inc.,* 549 P.2d 85 (Okl.1976); *Memphis Publishing Co. Nichols,* 569 S.W.2d 412 (Tenn.1978); *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976); *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976). *See also Rollenhagen v. City of Orange,* 116 Cal.App.3d 414, 172 Cal.Rptr. 49 (1981); *Lawrence v. Bauer Publishing & Print Co.,* 176 N.J.Super. (A.D.) 378, 423 A.2d 655 (1980); *Colombo v. Times-Argus Ass'n, Inc.,* 135 Vt. 454, 380 A.2d 80 (1977).

**4.** *AAFCO Heating & Air Conditioning Co. v. Northwest Publications Inc.,* 162 Ind.App. 671, 321 N.E.2d 580 (1975); *Chapadeau v. Utica*

*Observer-Dispatch, Inc.,* 379 N.Y.S.2d 61, 38 N.Y.2d 196, 341 N.E.2d 569 (1975); *Newspaper Publishing Corp. v. Burke,* 216 Va. 800, 224 S.E.2d 132 (1976).

**5.** I would adopt the negligence standard as set forth by the American Law Institute in the *Restatement (Second) of Torts* § 580B (1976):

"One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them."

of public or general concern. Any business adventure or personal activity which can somehow be construed to affect the "public" may be fair game for the press. The majority apparently holds that matters of public or general concern include anything which a "free press" deems would advance "truth, science, and morality." There may be no topic which is excluded from the reach of that standard.

A vigorous press is necessary to guard the public weal, but I see no reason to shield the news media from their own excesses. Private individuals have a right to expect conscientious and competent reporting before they are thrust into the public limelight by the publication of false and defamatory information. Paradoxically, the press now has an incentive to operate less professionally when it is investigating private individuals. It can effectively shield itself from tort liability for the publication of false information relating to private individuals on the basis of standards created in the majority opinion. *See, e.g., Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976); *Taskett v. King Broadcasting Co., supra.* I believe that traditional defamation law placed a premium on quality and competent journalism when the news media chose to focus on private individuals outside the public arena. We should retain this preference for individual freedom over sensationalist reporting, because, as the United States Supreme Court said in *Gertz,* "private individuals are more vulnerable to journalistic excess because they lack effective opportunities for rebuttal, unlike public officials or figures." 418 U.S. at 344–46, 94 S.Ct. at 3009–3010.

There are other reasons why the "matter of public or general concern" subject matter test is unadvisable. First, it requires that state courts determine on an *ad hoc* basis what constitutes a matter of public interest. *See Troman v. Wood, supra;* Collins & Diushal, *The Reaction of State Courts to Gertz v. Robert Welch Inc.,* 28 Case W. Res.L.Rev. 306 (1978). I doubt if this court can ever satisfactorily set forth a comprehensive and principled test of what the public interest includes.[6] Second, it places a substantial power with the press to determine what is in the public interest by the mere fact that the press deems the information newsworthy. There is, correspondingly, a reduction in protection afforded the private individual. *Troman v. Wood, supra.* Third, Colorado courts will now have the burdensome task of segregating "non-public interest," non-protected defamation from "public interest," protected defamation in cases where a story involves both public concerns and non-public concerns. For these additional reasons, I oppose the adoption of this unworkable standard and the saddling of Colorado's courts with the task of making hair-splitting distinctions in every defamation case.

It may be that the "public figure or official" requirement is not substantially more workable, but I believe it provides a more appropriate solution to the policies extant in these cases. I would therefore support the line of United States Supreme Court cases which uphold these distinctions. *New York Times v. Sullivan, supra; Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Wolston v. Readers Digest Association, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

The general policy concerns which this case has so clearly provoked illustrate the inability of the judicial branch to reach a satisfactory solution. I find the issue of the scope of Colorado's defamation laws best

---

**6.** As Justice Powell, writing for the court in *Gertz,* stated:

"The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable. And it would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not—to determine, in the words of MR. JUSTICE MARSHALL, 'what information is relevant to self-government.' *Rosenbloom v. Metromedia, Inc.,* 403 U.S., at 79 [91 S.Ct. at 1837]. We doubt the wisdom of committing this task to the conscience of judges. Nor does the Constitution require us to draw so thin a line between the drastic alternatives of the *New York Times* privilege and the common law of strict liability for defamatory error."

418 U.S. at 346, 94 S.Ct. at 3010.

left for legislative resolution and would therefore defer to the General Assembly for adoption of defamation standards. *See, e.g.,* section 13–25–127, C.R.S.1973. The policy considerations and compromise inherent in the legislative process make it a better forum for determining the balance between freedom of the press and individual liberty.[7] If change is to occur, the press should seek legislative relief from what it perceives are overly restrictive defamation laws. The judicial branch remains to insure that the General Assembly's judgment does not exceed the boundaries of Art. II, sec. 10 of the Colorado Constitution.

Private individuals continue to need an effective remedy to vindicate their interests when the press utilizes its great powers and publishes false and defamatory material. Accordingly, I dissent.

---

**7.** I agree substantially with what the Hawaii Supreme Court said in *Cahill v. Hawaiian Paradise Park, supra:*

"The plurality opinion in *Rosenbloom* and the decisions of the Indiana and Colorado courts cited are founded on the intuitive finding of the Justices, unaided by any empirical evidence, that exposure of the news media to liability for negligence in actions by private individuals for defamatory falsehoods has unduly restrained their freedom of expression. We have not been referred to any instance in which a matter of general or public interest has not been adequately reported because of self-censorship on the part of the news media. We do not have the means to develop empirical evidence to confirm or refute the intuitive findings of the *Rosenbloom* plurality. The nature and scope of the investigation which would be required for this purpose may be more suitable to a legislative resolution of this issue than one achieved by judicial decision. Moreover, experience with the public interest test of *Rosenbloom* has indicated that there are difficulties in its application."

453 P.2d at 1366 (footnotes omitted).