John RAMSEY; Patsy Ramsey; and Burke Ramsey, a minor, by his next friends and natural parents, John Ramsey and Patsy Ramsey, Plaintiffs,

v.

FOX NEWS NETWORK, L.L.C., d/b/a Fox News Channel, Defendant.

No. CIV.A.04–F–1464(PAC).

United States District Court, D. Colorado.

Jan. 6, 2005.

L. Lin Wood, L. Lin Wood, P.C., Atlanta, GA, for Plaintiffs.

Dori Ann Hanswirth, Hogan & Hartson, LLP, New York City, for Defendant.

## ORDER ON MOTION TO DISMISS

FIGA, District Judge.

## BACKGROUND

As was stated in another defamation lawsuit based on an underlying situation of intense national interest, albeit one of less tragic dimensions: "Long after the public spotlight has moved on in search of fresh intrigue, the lawyers remain." *Flowers v. Carville*, 310 F.3d 1118, 1122 (9th Cir. 2002).

Six-year-old JonBenét Ramsey was brutally murdered in her home on the night of December 25, 1996 or in the early morning hours of December 26. Her parents, along with her brother Burke, were in the house at the time of the murder. No one has ever been charged with the crime. Six years later, during the period of December 25–27, 2002, Defendant Fox News Network, L.L.C. ("Fox News") broadcast a report noting the sixth anniversary of the murder of JonBenét Ramsey and the state of the criminal investigation. A transcript of the broadcast, as set forth verbatim in Plaintiffs' Response to the Motion to Dismiss, is attached this opinion. Most pertinent is the following statement from the broadcast uttered by Fox News reporter Carol McKinley:

> Detectives say they have had good reason to suspect the Ramseys. The couple and JonBenét's nine year old brother, Burke, were the only known people in the house the night she was killed. JonBenét had been strangled, bludgeoned and sexually assaulted, most likely from one of her mother's paintbrushes. The longest ransom note most experts have ever seen-three pages-was left behind. Whomever killed her spent a long time in the family home, yet there

has never been any evidence to link an intruder to her brutal murder.

First Amended Complaint, ¶ 29.

The broadcast was televised nationally. Plaintiffs sue Fox News for defamation seeking compensatory and punitive damages.

Plaintiffs originally filed this case in the Northern District of Georgia on February 17, 2004. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 due to Fox News being a Delaware corporation and having its principal place of business in New York. At the time of the broadcast, JonBenét's parents, John and Patsy Ramsey, and their son Burke were citizens of Georgia. Plaintiffs' filings in this case indicate that in July 1997 they moved from Boulder, Colorado to Atlanta, where they lived until September 2003. They now reside in Michigan. U.S. District Judge Thomas W. Thrash, Jr. transferred the case to this district by order dated July 6, 2004. The transfer was made pursuant to 28 U.S.C. § 1404(a), which states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

On April 28, 2004, Fox News filed a motion to dismiss pursuant to F.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. That motion has been fully briefed. The Court heard oral argument on the motion on December 20, 2004.

## CHOICE OF LAW

### A. *Might It Make a Difference?*

The first question that the Court must address is whether Georgia or Colorado defamation law applies. This is not necessarily a minor issue. If Colorado, rather than Georgia, law were to apply, plaintiffs might well be subject to a higher proof

standard and might obtain a higher damages award.

■ In Colorado, the "actual malice" standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) is extended to situations like the one under consideration here where "a defamatory statement has been published concerning one who is not a public official or a public figure, but the matter involved is of public or general concern." *Quigley v. Rosenthal* 327 F.3d 1044, 1058 (10th Cir.2003), *cert. denied,* 540 U.S. 1229, 124 S.Ct. 1507, 158 L.Ed.2d 172 (2004), citing to *Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450, 457 (1975) and *Diversified Mgmt., Inc. v. The Denver Post, Inc.,* 653 P.2d 1103, 1106 (Colo.1982).

Under this higher standard, a person claiming defamation must prove with "convincing clarity" that the alleged defamatory statement was made with "actual malice"—that is, with knowledge that the statement was false or with reckless disregard of whether it was false or not. *Diversified Mgmt., Inc., supra,* 653 P.2d at 1105. (If a private individual were involved and the matter were not one of "public or general concern," under Colorado law such an aggrieved plaintiff would merely have to proof that the defamer was negligent. *Quigley, supra,* 327 F.3d at 1058 n. 4, *Williams v. District Court,* 866 P.2d 908, 912 n. 4 (Colo.1993).)

■ In contrast, under Georgia law someone who is not a public figure claiming defamation need only prove negligence on the part of the defamer, even if the matter involving the private person is a matter of public or general concern. *Triangle Publications, Inc. v. Chumley,* 253 Ga. 179, 180–81, 317 S.E.2d 534, 536 (1984). Here, plaintiffs claim they are not public figures for purposes of this action. First Amended Complaint, ¶ 42.

Secondly, which state's law applies would affect the maximum amount of recovery plaintiffs could receive. Under Colorado law, noneconomic loss or injury is capped at $366,000, including loss of reputation. C.R.S. § 13–21–102.5(3)(a) (a court can raise the actual damage limit to $500,000 only if it "finds justification by clear and convincing evidence" to exceed the limit); *James v. Coors Brewing Co.,* 73 F.Supp.2d 1250, 1253 (D.Colo.1999) (loss of reputation damages are subject to the statutory cap). Georgia, on the other hand, has no cap on compensatory damages. *See, e.g., Esenyie v. Udofia,* 236 Ga.App. 155, 156–57, 511 S.E.2d 260, 261–62 (1999) (upholding $3,000,000 slander compensatory damage award). Both states cap punitive damages, but it is a little easier to wiggle out of Georgia's cap. *Compare* Colorado law, C.R.S. § 13–21–102(3) (limiting punitive damages to actual damages although they may be trebled in some circumstances), with Georgia law, Ga. St. 51–12–5.1(f) and (g). Georgia's statute limits punitive damages to $250,000, but that limit does not apply where "defendant acted, or failed to act, with the specific intent to cause harm." *See, e.g., Esenyie v. Udofia, supra,* 236 Ga.App. 155, 156–57, 511 S.E.2d 260 ($3,000,000 compensatory damages in slander case upheld).

## B. *Which State's Law Applies?*

■ This Colorado Court must look to Georgia's choice of law rules to see which state's law applies here. This is because a court sitting in diversity that has a case transferred to it from another district must apply the choice of law rules of the transferor court. *Van Dusen v. Barrack,* 376 U.S. 612, 635–37, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Trierweiler v. Croxton & Trench Holding Corp.,* 90 F.3d 1523, 1532 (10th Cir.1996). Georgia generally applies what is known as the *lex loci delicti* approach to determine which state's

law applies in a tort context. *See, e.g., Risdon Enterprises, Inc. v. Colemill Enterprises, Inc.*, 172 Ga.App. 902, 903, 324 S.E.2d 738, 740 (1984) citing 15A C.J.S. 459, *Conflict of Laws*, § 12(2)(6) ("The general rule is that the 'place of the wrong, the locus delicti, is the place where the injury sustained was suffered rather. than the place where the act was committed, or, as it is sometimes more generally put, it is the place where the last event necessary to make an actor liable for the alleged tort takes place.'") Georgia therefore applies the "place of the wrong" approach as recognized in the *Restatement (First) of Conflict of Laws* § 377 (1934). The First Restatement points out in a comment that the "place of the wrong" in a defamation action is "where the defamatory statement is communicated." *Id.* at Note 5. However, it appears that in a multistate defamation case involving a media broadcast, Georgia would apply the "most significant relationship" .test as set forth in the *Restatement (Second) of Conflict of Laws* § 150 (1971). *See Ramsey v. Courtroom Television Network, LLC*, No. 1:01–CV–1561–CC (N.D. Ga., July 10 & Aug. 28, 2002) (Cooper, J.) (Burke Ramsey suing for defamation related to a multistate television. broadcast).

As stated at the oral argument on December 20, 2004, in applying the "most significant relationship" test to the instant matter, and mindful of the factors set forth in Comment e to the Restatement (Second) § 150 "Multistate communication involving natural person," it is clear that Colorado, not Georgia, is the state having the most significant relationship to alleged defamation. Certainly, Judge Thrash of the Northern District of Georgia appears to so agree in his July 6, 2004 order in which he states at p. 12, "This is primarily a Colorado case, with a Georgia connection that is at best, now tenuous." The broadcast at issue concerns the murder of a child who died in Colorado while plaintiffs lived in Colorado. The statements in question particularly relate to alleged acts or omissions of plaintiffs while they resided in this state. Employees of Fox News who lived and worked in Colorado developed the report. The investigation leading up to the report dealt mainly with Colorado sources and the injuries sustained by plaintiffs, if any, occurred as much in Colorado as elsewhere. Colorado has an interest in applying its defamation laws to Colorado-based journalists, to be weighed along with other considerations. Therefore, Colorado's substantive law applies.

The fact that plaintiffs lived in Georgia at the time the lawsuit was filed is not insignificant. According to the *Restatement (Second)* .§ 150(2), the state where plaintiffs aggrieved by an allegedly defamatory television broadcast are domiciled is usually the state having the most significant relationship for choice of law purposes. Yet that Restatement section recognizes that the law of the domicile of the allegedly defamed is not always applied. *See* Comment e to Section 150. The state of plaintiffs' domicile can be outweighed by other considerations. Plaintiffs cite to no specific injuries they suffered in Georgia as opposed to Colorado, Michigan or some other state. Georgia's nexus to the claim is at best limited. Paragraph 56 of the First Amended Complaint asserts plaintiffs "suffered permanent injury throughout the United States and the world" because of the Fox News broadcast. Although that paragraph goes on to assert that the most significant damage to plaintiffs' reputation occurred in Georgia where they were living in December 2002, plaintiffs plead no facts to support that assertion. Rather "millions" of viewers were exposed to the broadcast according to ¶¶.57–60 of the First Amended Complaint. The Court takes that to mean throughout the United States and the world as referenced in ¶ 56, not just Georgia. Georgia is the state of residence of

one of plaintiffs' counsel. However, that is not a significant factor for purposes of which state has the most significant relationship. *See Reyes v. Experian Info. Solutions, Inc.*, 2003 WL 22282515 *1, 2003 U.S. Dist. LEXIS 17678 *6 (N.D.III. Oct. 2, 2003).

## A MATTER OF PUBLIC OR GENERAL CONCERN

■ The next question is whether the broadcast related to a matter of public or general concern. The parties so stipulate and the Court agrees. Judge Thrash recognized this as such in his July 6, 2004 order at p. 12, where he describes the case as being "sensational." It appears he is referring to the underlying events described in the broadcast. Also, there is supporting precedent in other cases. In *Miles v. Ramsey*, 31 F.Supp.2d 869 (D.Colo.1998), Judge Brimmer, acting as a district judge for the District of Colorado, stated:

> The Court finds that the JonBenét murder investigation falls in the later category—one in which the public may have a legitimate public interest. It is undeniable that JonBenét's murder investigation has drawn almost unprecedented media attention. Given the media spectacle that surrounds the investigation, it is reasonable to assume that the public at large would legitimately be interested in the Enquirer's statements about the investigation, despite the Enquirer's tabloid status.

*Id.* at 875. The same holds true for the Fox News broadcast.

## DEFAMATORY MEANING

### A. *Applicable Standards*

The next question is whether the broadcast is capable of defamatory meaning as against plaintiffs. In deciding this issue the Court must construe the averments of the First Amended Complaint in a light most favorable to plaintiffs. *Montgomery*

*v. City of Ardmore*, 365 F.3d 926, 935 (2004). A court considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure generally is limited the four corners of the complaint. However, where as here the parties have provided additional materials for purposes of context and background, including Fox News showing a videotape of the broadcast without objection from plaintiffs at oral argument, the Court may and will consider them and treat the motion as one for summary judgment. F.R.Civ.P. 12(b); *Sanders v. Acclaim Entm't, Inc.*, 188 F.Supp.2d 1264, 1270 (D.Colo.2002); *Tonnessen v. Denver Publ. Co.*, 5 P.3d 959, 962–63 (Colo. App.2000) (applying Colorado's counterpart rule to a defamation claim).

■ Defamation is a communication holding an individual up to contempt or ridicule that causes the individual to incur injury or damage. *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo.1994); *Gordon v. Boyles*, 99 P.3d 75, 78 (Colo.App.2004). To be defamatory, a statement need only prejudice the plaintiff in the eyes of a substantial and respectable minority of the community. *Burns v. McGraw–Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1357 (Colo.1983). A television broadcast of defamatory matter is defamation by libel. *Restatement (Second) of Torts* § 568A (1977); *Holley v. WBNS 10TV*, 149 Ohio App.3d 22, 27, 775 N.E.2d 579, 582 (2002), cited by the Colorado Court of Appeals in *Gordon, supra*, 99 P.3d at 78.

■ Whether a statement is defamatory presents a legal issue for the Court to determine. *Gordon, supra*, 99 P.3d at 79; *Tonnessen, supra*, 5 P.3d at 963. Plaintiffs, as Fox News points out, have asserted a claim of defamation *per se*. That is, on its face and without extrinsic proof, the statement is unmistakably recognized as injurious and specifically directed toward the plaintiffs. *See Lininger v. Knight*, 123

Colo. 213, 226 P.2d 809 (1951); *Gordon, supra,* 99 P.3d at 78–79. To determine defamation *per se,* the Court must examine the statement itself without the aid of inducements, colloquialisms, innuendoes or explanatory circumstances. *Arrington v. Palmer,* 971 P.2d 669, 671 (Colo.App.1998). A statement constitutes defamation *per se* if it imputes a criminal offense. *Id.* Defamation *per se* is actionable without pleading or proof of special damages.

 Defamation *per se* differs from defamation *per quod,* which requires innuendo or extrinsic evidence to establish its defamatory nature. *Bernstein v. Dun & Bradstreet, Inc.,* 149 Colo. 150, 156, 368 P.2d 780, 783 (1962); *Keohane, supra,* 882 P.2d at 1297 at n. 3. Special damages, that is specific monetary losses (which exclude injuries to a plaintiff's reputation or feelings not resulting in quantifiable monetary loss), must be pled and proved in a defamatory *per quod* case. *Bernstein, supra;* C.J.I. 4th Instruction 22:12. Here, plaintiffs have only pled a defamation case based on defamation *per se,* and the analysis of the motion to dismiss proceeds accordingly.

 To determine defamation, the Court must view the broadcast as a whole rather than dwell upon specific parts of the broadcast. The Court must give each part its proper weight and the entire broadcast the meaning that people of average intelligence and understanding would give it. *See* C.J.I. 4th, Instruction 22:10; *Burns, supra,* 659 P.2d at 1357; *Tonnessen, supra,* 5 P.3d at 963. In determining whether words are defamatory, the Court is to give them their ordinary and popular meaning. *Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 517 (10th Cir. 1987) (applying Colorado law).

B. *Discussion*

 Applying the above legal standards to the contents of the Fox News broadcast reveals a lack of defamatory meaning in this *per se* case as a matter of law. Taking the broadcast as a whole, it did not hold up any member of the Ramsey family to public contempt or ridicule or accuse any of them of participating in the murder their youngest family member. The broadcast was not a particularly unfair or unreasonable recapitulation of recent events on or about the sixth anniversary of the murder.

The broadcast reports that plaintiffs have recovered millions of dollars from "people who called JonBenét's older brother Burke, who's been cleared, a suspect." This statement does not state or imply that Burke Ramsey ever was a suspect, only that "millions of dollars have changed hands" as a result of making that accusation against one who has been cleared of suspicion by authorities. Being "cleared" is a concept not synonymous with having been a suspect but no longer being one. Persons not "suspects" are "cleared" by law enforcement all the time without a prior imputation of wrongdoing. Even John Ramsey in a sworn affidavit in another lawsuit used that phasing after expressly denying that Burke ever was a suspect: "My son, Burke Ramsey, has been officially cleared in connection with the death of his sister." Exhibit A at ¶¶ 5, 6 & 8 to Hanswirth Declaration in Further Support of Defendant's Motion to Dismiss, which affidavit was filed in *Otworth v. Ramsey,* File No. 1–00–CV–2023–CAM. Nothing else in the broadcast links Burke to the crime.

The broadcast goes on to state that "the Ramseys have successfully sued tabloid and mainstream media for defamation. Former employees have sued the Ramsey's for the same reason. But still no one stands responsible for the six year-old murder of the little beauty princess." All true, and while the broadcast does not

exonerate plaintiffs from any involvement in the murder, it need not in order to avoid being defamatory. Moreover, reporting that plaintiffs have successfully sued for defamation suggests that plaintiffs have been falsely accused of complicity in the crime.

The language in the broadcast that plaintiffs found most offensive, quoted at the top of this opinion, does not create a jury issue as to defamation. John and Patsy Ramsey acknowledge that they "were at some point in the past described by the Chief of the Boulder Police Department as being 'under the umbrella of suspicion' with respect to the investigation of the murder of JonBenét Ramsey." First Amended Complaint, ¶ 24. The statement "detectives say they had good reason to suspect the Ramseys" appears not to refer to Burke. The next sentence goes on to say: "The couple and JonBenét's nine year old brother, Burke, were the only known people in the house the night she was killed"-indicating that the preceding reference to "the Ramseys" was to John and Patsy, not Burke. Even if the broadcast could be construed as implying that Burke was once a suspect in the eyes of Boulder law enforcement officials-something the Court concludes it does not-such a statement would not be defamatory as the broadcast goes to assert that law enforcement has "cleared" him. A statement that detectives once said they had good reason to suspect someone now unequivocally cleared of having committing a crime is insufficient to meet the high threshold for defamation *per se.*

Importantly, a major thrust of the broadcast was to report "a recent major development," that the Boulder Police Department "long suspicious of the Ramseys, has turned the case over to District Attorney Mary Keenan, to bring 'fresh eyes' to the investigation." Plaintiffs' own counsel in this case, Lin Wood, Esq., appears in the broadcast stating: "This is new day in this investigation. The days of the Ramseys being the focus of the investigation ... those days are over." Clearly the broadcast reflects that the investigation is moving in a new direction, one in which none of the plaintiffs is being accused or suspected of being involved.

The Colorado Supreme Court has observed that "in order to insure 'uninhibited, robust, and wide-open' debate on matters of public concern, 'a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation,' or which 'cannot reasonably [be] interpreted as stating actual facts about an individual,' continues to receive full constitutional protection." *NBC Subsidiary (KCNC–TV), Inc. v. Living Will Center,* 879 P.2d 6, 10 (Colo.1994), quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

Here the broadcast did not make any judgment as to who was involved in the murder nor did it urge any provably false factual connotation suggesting that plaintiffs were complicit in any crime. In essence, the broadcast simply noted the following: that the killer of JonBenét Ramsey had not been determined; the case had very few pieces of physical evidence and the crime scene had been contaminated; the only known people in the home that night were Ramsey family members; whoever killed JonBenét spent a long time in the home but no evidence linked to an intruder had been found; Boulder law enforcement officials suspected John or Patsy Ramsey of committing the crime; Burke had been cleared of suspicion and recovered monetary settlements from media outlets who designated him otherwise; and, the investigation is shifting its focus away from John and Patsy Ramsey in part due to the new

Boulder District Attorney who would be taking a fresh look at the investigation. Looking at the totality of the broadcast, the plain meaning of its language and John and Patsy Ramsey's acknowledgment that they had been suspected, no defamatory meaning as against plaintiffs can be derived from it as a matter of law.

 The Court has considered all other arguments of plaintiffs and finds them to be unmeritorious. Specifically, the statement as to the absence of evidence of an intruder, even if untrue as plaintiffs claim, is insufficient to constitute an accusation of misconduct as against plaintiffs. The statement no more suggests that plaintiffs are blameworthy than it suggests that a stealthy intruder covered his or her tracks well, the investigation to date had a "Keystone Kops" flavor to it or a new crime-solving effort unburdened by preconceived notions may well lead to the "real killer." It is not a sly nod towards plaintiffs as evildoers.

## CONCLUSION

The Colorado Supreme Court has noted that "[p]rotecting the important competing interests of free speech and reputation requires a flexible approach anchored in the context of each cause of action." *Burns, supra,* 659 P.2d at 1360. This balancing act is especially precarious given the high stakes involved. Compare the obvious primacy the Constitution and the interpreting case law places on free speech with the importance, of indeed Shakespearean proportions, accorded one's reputation:

> Good name in man and woman, dear my lord, is the immediate jewel of their souls: Who steals my purse steals trash; 'tis something, nothing; 'twas mine, 'tis his, and has been slave to thousands; but he that filches from me my good name robs me of that which not enriches· him, and makes me poor indeed.

William Shakespeare, *Othello,* Act III, scene iii. Factored into this "flexible approach" when considering a motion for summary dismissal is the recognition that the threat of protracted litigation in defamation cases could have a chilling effect upon constitutionally protected rights of free speech. *See Lockett v. Garrett,* 1 P.3d 206, 210 (Colo.App.1999). Because of the respect accorded expression in matters of public concern under the First Amendment, in this type of case the existence of a material fact must be established with convincing clarity. *Gordon, supra,* 99 P.3d at 78. Plaintiffs did not establish any such material fact here.

These constitutional protections are not just for broadcast media. Indeed, free speech itself acts as a check on the media. For example, in our current technologically-advanced era anyone can get on the internet, become a self-proclaimed journalist or pundit and draw a worldwide audience. Webloggers can in a matter of hours point out key errors in reporting by mainstream media outlets. When people have the means and expertise to generally publish fair and perhaps insightful comments quickly and easily on matters of public concern, such as what a crime scene reveals or does not reveal, law enforcement and the rest of us may benefit. The robust protections guaranteed by the First Amendment thus remain as important and valuable as ever.

Plaintiffs may well have filed this case more for vindication than for money, and perhaps vindication is what they deserve. But they have a better chance for meaningful vindication in the court of public opinion through vigorous debate about the background and details of this heinous crime than by suing those whose reporting may arguably include some less than favorable inferences about them. Plaintiffs

cannot have the public discourse playing field entirely to themselves.

Of course, those who broadcast publicly must accept some responsibilities of basic decency towards others as embodied in our Nation's defamation laws. Fox News, however, did not shirk those responsibilities here. While the December 2002 broadcast appears to plaintiffs not to have been "fair and balanced" towards them, it was not defamatory. The Court therefore GRANTS Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to F.R.C.P. 12(b)(6) and DISMISSES this case with prejudice.